**IN UNITED STATES DISTRICT COURT IN AND FOR THE
NORTHERN DISTRICT OF IOWA**

MARY CATHERINE DESOTO,

     Plaintiff,

  v.

MARK NOOK, ADAM BUTLER, ANN
BILDER, AMY NIELSEN, LEAH
GUTKNECT, TIFFANY DODD, KAYLEE
MICHAELSEN, BRENDA WHITE, JOSE
HERRERA, BRENDA BASS, and KARA
HUGHES, JOHN VALLENTINE, and THE
UNIVERSITY OF NORTHERN IOWA,

     Defendants.

Case No. 6:25-cv-2057 (MAR)


**FIRST AMENDED COMPLAINT**


**(JURY DEMANDED)**


## TABLE OF CONTENTS

I.  Preliminary Statement…………………,…………………………………..3

II.  Jurisdiction and Venue…………………………………………………..4

III.  The Parties………………………………………………………………4

IV.  Statement of Facts Applicable to All Counts…………………………..…..6

  A. Historical Enmity Between UNI and DeSoto……………………………6

  B. Ongoing Pattern of Sexual Bias and Retaliation: Repeated Refusal of
    UNI to Follow Title IX and Sex-Based Discrimination Policies…………9

  C. DeSoto Reengages in Criticism of UNI's Budget……………………….14

  D. UNI Actively Solicited and Manufactured A Complaint of Disability
    Discrimination Against DeSoto……………………………………..……18

  E. The Formal Disability Discrimination Complaint Against DeSoto……...34

  F. Biased Investigation…………………………………………………...44

  G. DeSoto Appeals Finding of Discrimination………………….…..……48

H.  Failure to Provide Due Process After Initial Appeal on Remand……….49

I.  Interference and Non-Compliance: Faculty Petition Committee………..56

J.  Doto's Second Appeal……………………………………….........52

K.  Interference and Non Compliance: Mandatory Faculty Hearing and
Internal Appeal Right………………………………………...……59

L.  DeSoto's Title IX Complaint…………………………….……...…60

V.  Summaries

A.  Ann Bilder……………………………………………………65
B.  Kara Hughes……………………………………………………67
C.  Leah Gutknecht…………………………………………………69
D.  Brnda White……………………………………………………70
E.  Kaylee Michelsen………………………………………………70
F.  Adam Butler……………………………………………………71
G.  John Vallentine………………………………………… 73
H.  Brenda Bass……………………………………………………73
I.  Jose Herrera……………………………………………………74
J.  Mark Nook……………………………………………………75
K.  Tiffany Dodd………………………………………… 75

VI.  Causes of Action

Count I – Violation of Title VII of the Civil Rights Act of 1964,
42 U.S.C. 2000e et. seq.
(Against Defendants Butler and UNI)……………………...83

Count II – Violation of Iowa Code Chapter 216, the Iowa Civil Rights
Act of 1965 as Amended
(Against UNI and Butler)…………………………...85

Count III – Violation of 42 U.S.C. § 1983 – Violation of First Amendment Rights
(Against Bulter, Nook, Neilson, Bilder, Dodd, Gutknecht,
Valentine, and
Bass)…………………………………………………88

Count IV – Violation of 42 U.S.C. § 1983 – Violation of Fourteenth
Amendment Property Rights
(Against Bulter, Nook, Bilder, Dodd, Bass, Michelesen, White, Gutknecht,
Nielsen, Vallentine, Herrera, and Hughes)…………………….…..92

Case 6:25-cv-02057-LTS-MAR    Document 17    Filed 01/06/26    Page 2 of 104

Count V – Violation of Title IX of the Education Amendments of 1972
20 U.S.C. § 1681 et. seq.
*(Against Bulter, Nook, Bilder, Bass, Dodd, Gutknecht,*
*Vallentine, White, and Michelsen)*……………………...95

Count VI – Defamation
*(Against Butler in his Individual Capacity Only)*…………….99

Count VII - Intentional Infliction of Emotional Distress
*=(Against Butler in his Individual Capacity Only)*………….101

Count VIII - Breach of Contract
*(Against UNI)*……………………………………………102

VII.    Damages …………………………………………………………103

VIII.   Jury Demand …………………………………………………...104

## I.      PRELIMINARY STATEMENT

Dr. Mary Catherine DeSoto is a tenured teacher, author and scholar at the University of Northern Iowa ("UNI"), where she has served for nearly twenty-five years. She is a highly respected and award-winning teacher and recipient of the 2023–2024 Distinguished Scholar Award. Her life and career have been defined by sustained political activism and public advocacy, including raising concerns about administrative spending, resource allocation, and institutional waste—positions that have, at times, placed her in sharp conflict with university administration. She is also a distinguished scholar on the biological underpinnings of behavior; her work has sometimes challenged prevailing assumptions and occasionally been controversial.

Following disturbing incidents in 2012 widely regarded by neutral observers as severe retaliation for protected speech, DeSoto felt compelled to enter an informal agreement with the university and curtail her criticism of spending waste. A decade later, in 2023, she resumed her

advocacy when she agreed to serve on UNI's budget committee and gave a presentation addressing administrative bloat and threats to course offerings while simultaneously questioning unsafe exam handling and asserting copyright to protect her intellectual property. In response, UNI officials launched a renewed campaign of retaliation marked by defamatory attacks on her professionalism and grave procedural violations—including denial of her right to appeal, undisclosed *ex parte* communications with decision-makers, and the deliberate exclusion of exculpatory evidence from investigative reports. The renewed retaliation followed immediately after this protected activity and was and was directly caused by DeSoto's protected activity.

These procedural abuses were further compounded by UNI's longstanding failure to address DeSoto's Title IX complaints of discriminatory harassment by a male administrator – who is now known to have been similarly harassing at least two other women. UNI administrators and leadership of the Equity and Compliance office, rather than upholding their federal obligation to investigate and instead consulted with upper administration who signaled undisclosed and unwavering institutional support for him and against DeSoto to the Title IX coordinator. UNI did nothing to investigate. A pattern of harassment persisted without investigation. The malfeasance culminated when UNI's Office of Compliance and Equity, now known as the Office of Civil Rights Compliance, weaponized the student complaint process in tandem with the Disability Accommodations Office (SAS) office. This conduct reflects an entrenched pattern of institutional misconduct that has inflicted profound harm on DeSoto's career and well-being and forms the basis for the present action. At its core, this case concerns the knowing disregard of mandatory procedures and constitutional protections by senior university officials in retaliation for protected speech and complaints of discrimination.

## II.    JURISDICTION AND VENUE

1.     This Court has personal jurisdiction and venue over all parties pursuant to the Notice removing this case from the Iowa District Court in and for Black Hawk County to the United States District Court entered on October 25, 2025. All events are believed to have occurred in this judicial district.

## III.    PARTIES

2.     Plaintiff Mary Catherine DeSoto (herein "DeSoto") is a resident and citizen of the State of Iowa. She is a tenured professor at the University of Northern Iowa located in Cedar Falls, Iowa.

3.     Mark Nook is a resident of the State of Iowa and is the President of the University of Northern Iowa. He is sued in his individual capacity only. At all times relevant he was acting under the color of State law.

4.     Adam Butler is a resident of the State of Iowa and holds the position of Department Head in the Department of Psychology and is DeSoto's supervisor. He is sued in his individual capacity only. At all times relevant he was acting under the color of State law.

5.     Ann Bilder is a resident of the State of Iowa and counsel to the UNI. She is sued in her individual capacity only. At all times relevant she was acting under the color of State law.

6.     Amy Nielsen is a resident of the State of Iowa and is the Associate Provost at UNI. She is sued in her individual capacity only. At all times relevant she was acting under the color of State law.

7.      Leah Gutknecht is a resident of the State of Iowa and is Assistant to the President and the Title IX Officer for UNI. She is sued in her individual capacity only. At all times relevant she was acting under the color of State law.

8. Tiffany Dodd is a resident of the State of Iowa and is Assistant Dean of Students-Students Accessibility Services at UNI. She is sued in her individual capacity only. At all times relevant she was acting under the color of State law.

9. Kaylee Michelsen is a resident of the State of Iowa and is the Associate Director & Deputy Title IX Coordinator for UNI. She is sued in her individual capacity only. At all times relevant she was acting under the color of State law.

10. Brenda White is a resident of the State of Iowa and is an Investigator and Prevention Specialist for UNI. She is sued in her individual capacity only. At all times relevant she was acting under the color of State law.

11. Jose Herrera is a resident of the State of Iowa and is the Provost and Executive President for Academic Affairs at UNI. He is sued in his individual capacity only. At all times relevant he was acting under the color of State law.

12. Brenda Bass is a resident of the State of Iowa and is the Dean of the College of Social & Behavioral Sciences at UNI. She is sued in her individual capacity only. At all times relevant she was acting under the color of State law.

13. John Vallentine is believed to be a resident of the State of Iowa and at all times relevant was Provost and Executive President for Academic Affairs at UNI. He is sued in his individual capacity only. At all times relevant she was acting under the color of State law.

14. Kara Hughes is a Senior Solutions Specialist at Grand River Solutions at all times relevant was working as a "Decision Maker" for the University of Northern Iowa concerning discrimination complaints. Her domicile is unknown. She performed decision-making functions delegated by UNI and exercised authority traditionally reserved to the University. She is sued in

her individual capacity only. At all times relevant she was acting under the color of State law based on her having been hired by the University of Northern Iowa.

15. The University of Northern Iowa (herein "UNI") is a state-run university. By statute, it is a creation of State law governed by the Iowa Board of Regents. It is located in Cedar Falls, Iowa.

## IV. STATEMENT OF FACTS APPLICABLE TO ALL COUNTS

### A. Historical Enmity Between the UNI and DeSoto

16. DeSoto was the twice elected President of the "United Faculty" from 2010 through 2013. DeSoto regularly asserted that the budgetary concerns and the corresponding needs for perpetual budget cuts by the University were caused by excessive spending on administration and used to demand more tax and tuition money while reducing teaching staff and course offerings. DeSoto often asserted this damaged the overall education experience of UNI students. The extent of her activism was evidenced by front page local newspaper articles, national news stories, and presentation to the Iowa legislature on the budget and wasteful spending. In 2012, at DeSoto's urging, UNI's Faculty voted 197-53 in favor in support of a "no-confidence" motion against UNI's then-President Benjamin Allen who was seeking to reduce course offerings and lay off dozens of faculty. DeSoto's actions to restore fiscal responsibility and protect the core educational mission of the university were covered in the Des Moines Register and resulted in national level "bad press," prompting a highly atypical public response by university leadership.

17. Then-President Benjamin Allen, without speaking with DeSoto, issued a public statement falsely accusing her of being anti-military. DeSoto is not and was not anti-military, and she has multiple close family members who served with distinction in the U.S. Army. As a direct

result of Allen's statement, DeSoto received hundreds of hate emails, death threats, and experienced acts of vandalism. These attacks were widely recognized by neutral observers as calculated retaliation for her protected speech opposing UNI's budget cuts and the reduction of faculty positions. The President of the national American Association of University Professors (AAUP) and **The Chronicle of Higher Education** publicly described Allen's statements as "prejudicial and inflammatory" and retaliatory, arising from DeSoto's prior opposition to the University's budgetary actions. As in events a decade later, a student was exploited. Allen's suggestion that the student's grade was at risk was false. The student was never upset with DeSoto and in fact sought to serve as her teaching assistant. The evidence shows UNI's practice of exploiting students while mischaracterizing DeSoto is an ongoing pattern. The student from 2012–2013 would testify that his issue was with UNI policy, not with DeSoto, who supported the student throughout. The parallels to the 2024-2025 events reveal a repeated pattern of misconduct using students complaint process to harm DeSoto for her protected speech.



THE CHRONICLE OF HIGHER EDUCATION

FACULTY

**Grading Furor Over National Guardsmen Left Northern Iowa Professor Fearing Attack**

U. of Northern Iowa

The faculty union has accused the U. of Northern Iowa's president of wading into a dispute in a way that may have provoked public controversy and caused a professor to be harassed and threatened.

*By Peter Schmidt* | NOVEMBER 02, 2012

[*Updated (11/2/2012, 5:39 p.m.) with comment from the AAUP's president.*]

The University of Northern Iowa's faculty union has accused that institution's president, Benjamin J. Allen, of administrative misconduct for wading into a grading dispute between a professor and a student in a way that stirred public controversy and may have caused the professor to be harassed and threatened.

In a statement released this week, the United Faculty, a union affiliated with the American

18. The press release and associated events received national media coverage. The fallout of the public reprimand was swift and severe and was coordinated through the UNI Press Office, and bypassed internal academic or faculty-governance channels.. To make clear the level of animosity, the zeitgeist was still very pro-military and the statement released via press release that DeSoto was anti – military by a university president spread across the region and country and was covered by news outlets across the nation. Characterizing a faculty member as anti-military in a public statement was highly atypical and foreseeably incendiary. As a result, hate poured out. For a period, DeSoto required university-provided security escorts to and from classes for her personal safety. Her car was vandalized, and the words USA carved into the paint. Such public denunciation of a faculty member by a university president, with foreseeable safety consequences, was extraordinary and outside the norms of university practice. After DeSoto's safety was put at risk and due to the increasing hostilities, effects on her stress, health and family, DeSoto, under duress, advised the UNI administration (in an August 2013 face to face meeting with the new and then President Mark Rudd, and with a follow up email) that she would formally back away from her activism and budget criticism. She stopped making public presentations about the University and withdrew from public criticism of the university. She did not seek a third term as President of the United Faculty.

**B.** **Ongoing Pattern of Sexual Bias and Retaliation: Repeated Refusal by UNI to Follow Title IX and Sex Based Discrimination Policies**

19. Beginning in December 2016 and continuing through September of 2024, DeSoto repeatedly sought assistance from UNI's Office of Civil Rights Compliance (OCRC) regarding hostile and discriminatory conduct by her supervisor, Adam Butler based on her gender and protected speech. Butler's behavior sharply changed beginning in 2017; previously he had highly valued DeSoto's advice and placed her on numerous faculty committees. In late fall or December

2016, Butler openly criticized her then-recent marital separation and lectured DeSoto about her personal life, criticizing her responsibilities as a *mother* and asserting that her "*place*" was at home with her husband and children, while making no similar remarks to her estranged husband, a faculty member in the same department. Around this time, Butler also threatened to assign her a teaching schedule she could not meet as a newly single mother of young children (early class assignment) —a very unusual action based on departmental norms; it was highly stressful for DeSoto. DeSoto's estranged husband (male co-worker in the exact same position with UNI) suffered no effects or harassment.

20. DeSoto contacted OCRC Director Gutknecht and agreed to attempt an informal resolution, her original preference. An informal resolution meeting occurred on January 25, 2017. The hostility did not abate; it intensified. Butler's harassment and lecturing continued after DeSoto eventually got divorced. After DeSoto's divorce was finalized, the hostility and resentment intensified while at the same time, Butler gave no criticism to her male ex-husband.

21. After an unsettling interaction with Butler on January 5, 2017, in which Butler followed DeSoto into her office closing the door behind him and another time when he chastised DeSoto for involving OCRC in their dispute, DeSoto again contacted the OCRC. DeSoto reported the incident to Leah Gutknecht and the OCRC, but nothing was done. The failure to assist DeSoto in pursuing her complaint is in clear violation of UNI's Title IX policy – policy 13.02. (UNI Policy 13.02, Process B, incorporated herein here process-b.pdf.

22. On January 31, 2017, DeSoto formally requested that her concerns proceed through a formal complaint, detailing Butler's inappropriate personal comments, harassment, discrimination, and retaliation. Again, UNI, and Gutknecht redirected DeSoto back to informal resolution rather than initiating a formal investigation. Gutknecht repeatedly mischaracterized

DeSoto's complaints as arising from "marital status" discrimination instead of *sex*-based discrimination. The conduct of Gutknecht was in open violation of UNI's Title IX policy. The misdirection by UNI and Gutknecht, steering DeSoto away from sex discrimination and retaliation complaints was purposeful and biased, and a clear violation of policy 13.02.

23.     Gutknecht broke important confidentiality requirements and strayed far afield from UNI's policy 13.02 procedures when she consulted with upper administration about DeSoto's complaint, prior to any investigation and without sharing the information with DeSoto. Dean Bass, after being notified about DeSoto's complaint, signaled strong support for Butler to Gutknecht. Incredibly, two days after the informal resolution attempt, on January 27, 2017, Gutknecht also spoke off the record with Butler, the respondent and a university administrator. Gutknecht told Butler on January 27, 2017, that she believed DeSoto's concerns "*did not rise to the level of discrimination*,"[1] in an apparent attempt to assure Butler that the University backed

---

[1] This is not conjecture, the fact that such consultation and advisement by upper administration was long suspected but confirmed in the university's response to the IRCR. Within the documents, UNI Legal Counsel (Ann Bilder) noted these "off the record" consultations happened and the gist of what transpired (support for Butler, reassurance to Butler). Moreover, Gutknecht's labeling DeSoto's complaint as "marital status discrimination" misses the mark. Neither Title IX nor Iowa Code Chapter 216 recognize *marital status discrimination*. The law prohibits discrimination based on sex. The behavior DeSoto was consistently describing, was clearly sex based, and as she ultimately asserted in her formal Iowa Civil Rights Commission complaint, and in her formal UNI complaint that she was being discriminated against based on her *sex and retaliation*. As a woman, DeSoto was singled out for abuse during her divorce while her male counterpart was not. Gutknecht and others in the OCRC, with varying success, gently pushed DeSoto to limit her complaints as "marital status" discrimination knowing that Title IX did not prevent such discrimination. *DeSoto has consistently asserted that she was treated differently than her male counterpart and ex-husband, a professor in the same department.* Her male counterpart was not lectured on topics such as "motherhood" and staying in his "place" during and after the divorce. Her male counterpart was not told that his "place" was at home with his wife. Further the retaliation aspects of her complaint are extraordinary and were purposely ignored by UNI, Gutknecht, and others at UNI.

him.. This type of bias, pre-judging and placing obstacles in the way of the filing of a formal Title IX Complaint is strictly prohibited by Title IX standards and policy 13.02.

24. UNI and Gutknecht's pre-judgment and mislabeling and blatant violation of Title IX policy and procedure extended to Dean Bass, who then falsely told DeSoto that her allegations against Butler had been "investigated and found baseless," even though no formal complaint or investigation had ever been filed.

25. These breaches of confidentiality and prejudgment of the merits of DeSoto's complaints further chilled DeSoto's ability to pursue her Title IX and Title VII rights. Over the ensuing years—including September 2018, April 2021, May 2021, June 2021, and November 2021—DeSoto repeatedly sought to file formal complaints with OCRC and each time, Gutknecht delayed, discouraged, or deflected her, steering DeSoto toward various informal steps while no formal process was ever initiated and no investigation occurred. Wrongful and harsh reprimands from Butler and disparate treatment by Butler caused DeSoto to repeatedly seek help, attempts that were always intentionally blocked by Gutknecht and the OCEM/OCRC. All the above actions are in clear violation of UNI's Title IX policy – 13.02.

26. Some examples include an email dated April 17, 2017, DeSoto wrote directly to Leah Gutnecht, "I believe my attempt at seeking help from [OCRC] backfired and that he is worse and not better. This is a serious concern, as I realized again concretely over the past few days. I am fearful and saddened." The email further emphasized that, "Still, students are being told not to work with me, and my department head is openly hostile at times and covertly so other times. My attempts to get grants are oddly and distinctly thwarted by my department head together with OSP." Despite these obvious complaints on continued retaliation by Butler,

DeSoto's right to an investigation via the OCRC process was purposely interfered with by UNI, Gutknecht, and others in violation of Title IX policy – 13.02.

27.     May 20, 2021, DeSoto again contacted Gutknecht expressing some confusion about the lack of responses. Gutknecht responded by acknowledging she had forgotten to send relevant policy information to DeSoto as requested.

28.     On November 4, 2021, "I have not abandoned my discrimination and retaliation complaint." Gutknecht responded by recommending that DeSoto not proceed with a Title IX Complaint and instead seek further informal resolution through the Associate Provost's office. Again, no complaint was ever filed, moreover the Provost office did not facilitate any such meeting.

29.     No formal investigation by UNI, Gutknecht, or Michelsen occurred until November 2024, following a September 17, 2024, harassment incident that prompted DeSoto, now aided via current counsel, to finally insist on a formal inquiry (as summarized chronologically below and discussed in detail in Section J). It then took a month and multiple meetings and revisions for Gutknecht to 'accept' her formal complaint. DeSoto was repeatedly and continuously discouraged and prevented from filing a complaint that would trigger an official investigation continually from 2017 to 2024 in blatant violation of Title IX and policy 13.02, as summarized chronologically below.  These allegations are pleaded to establish actual notice, deliberate indifference, and a continuous pattern of institutional obstruction culminating in the 2024 disciplinary actions.

| 2015 | Initial marital separation (Ex is also tenured member of Psych dept). Butler twice lectured CD in a loud, overbearing way that her place is "home with husband." Pounds on desk. |
| Dec 2016 | Initial contact with OCEM for help. |

| | |
|---|---|
| Jan 5, 2017 | CD Email to LG reporting Butler came into office; asking LG for help. |
| Jan 19, 2017 | LG offers times for a meeting with Butler to informally resolve. |
| Jan 25, 2017 | Informal meeting occurs with LG and other staff, Butler, and CD. |
| *Jan 27, 2017 | **LG calls Butler -- and assures him no complaint will happen.** |
| Jan 31, 2017 | CD Email to LG reporting behavior of Butler that day and asking about formal process. |
| Feb 10, 2017 | LG responds she's willing to meet to discuss concerns. Meeting occurs, no compliant is filed. |
| *Feb 2017 | **LG meets with Dean Bass, they plan to let Dean bass handle it.** |
| Apr 4, 2017 | CD email LG, Reports another issue with Butler. |
| Apr 12, 2017 | CD email LG and states: "I believe my attempt at seeking help with OCEM backfired and that he is worse and not better." CD reported fear. |
| *April 2017 | **Bass contacts LG and states directly her opinion that Butler does not discriminate, that he does not have a short fuse, and signals admin supports Butler over CD.** |
| Apr 13, 2017 | LG describes her contact with Bass to CD as a discussion of how they could "best resolve" the concern. |
| Apr 21, 2017 | CD again asks for help, expressing fear and urging investigation. No inquiry occurs; no complaint is filed. |
| Sept 7, 2018 | Additional contact (email) asking for help. |
| Apr 7, 2021 | Additional contact (email) asking for help. |
| Apr 16, 2021 | Meeting occurred. LG says DeSoto needs to review the detailed policy in order to file a formal complaint, and says she will send it to CD. |
| May 20, 2021 | Desoto email LG and ask if LG forgot to send the policy and guidelines? LG admits she had "forgot" and apologized. |
| June 28, 2021 | Email to LG: "I'd like to move forward with a formal complaint." |
| June 29, 2021 | LG said she couldn't proceed without more details and asked CD to cite specific policy. |
| Nov 4, 2021 | Emailed LG expressing fear of retaliation; no assurance or protection given. Harassment continues. |
| Summer 2024 | DeSoto seeks and obtains Legal counsel. |
| Sept 2024 | Reported a new harassment incident via the university online form, under advice from legal counsel. |
| Year of "investigation" Sept 2024 to August 2025 | The year produced no report. There were multiple long investigative meetings with complainant DeSoto, only *one* with the respondent Butler. The year also saw witness intimidation and evidence destruction by Butler—reported to OCEM but not prevented. DeSoto sent a formal Notice of Bias within OCEM, exactly as the policy directs, UNI ignored it. UNI's attorney Ann Bilder ended the investigation. It remains "paused". |

CD = DeSoto, LG= Leah Gutnecht, *= known via Anne Bilder's statement in written response to ICRC.

30.     Throughout the period of 2017 through September 24, Butler assigned course load in a discriminatory manner so that DeSoto had the heaviest teaching load of any faculty member in the Department with the largest lecture classes,  provided unfair performance reviews which limited her ability to advance her career; and diminished the number of  "biological" psychology[2] course offerings in which only DeSoto specialized. The Higher Leaning Commission (HLC) external review process, an independent agency founded in 1895 which accredits degree-granting colleges and universities repeatedly criticized the psychology department and Butler for reducing and eliminating biological psychology course offerings, stating that, "it is dismaying that the department continues to minimize neuroscience in its undergraduate curriculum." Since Butler began discriminating against DeSoto, a biological/neuroscience psychologist, these course offerings were diminished in defiance of their mandated expert external review. These independent reviewers have written the lack of biological courses in the curriculum "leaves a big hole in their foundational education."

31.     UNI and Butler's actions to diminish biological psychology are not based on pedagogical justification, but directly and discriminatorily directed at DeSoto personally as the only remaining "biological" psychology faculty member on staff as purposeful actions to make her workplace less desirable and push her out of the University. These attacks have been ongoing

---

[2]  The biological approach explains human behavior, cognition, and emotions through internal biological mechanisms like genetics, brain function, hormones, and neurotransmitters. There is a historical schism in behavioral sciences concerning biological and social psychological approaches.

since 2017 drastically affecting DeSoto's ability to build her academic reputation and advance her scientific interests all while creating a worsening hostile work environment.

32. From 2017 through DeSoto's forced medical leave in 2025, Butler has repeatedly and raised his voice to DeSoto and yelled at other female faculty members treating them in an openly hostile manner different than their male counterparts. This is a direct result of UNI's failure to investigate credible allegations of discriminatory harassment under their Title IX obligations. For example, Rebecca Dickenson, another female tenured professor at UNI in the Social Work Department, reported multiple incidents over the past three years where Butler, as temporary Head of her Department, has yelled and screamed at Dickenson for simple disagreements much the same way he has repeatedly done so towards DeSoto. Butler does not direct this harassment at male members of either the Social Work or Psychology Departments, only subordinate females. Professor Dickenson states that Butler has attempted to weaponize the "student discrimination policy" against her. UNI nefariously encourages students and others to file "manufactured" and mendacious complaints against faculty it disfavors, including DeSoto and Dickenson, while at the same time not processing valid complaints against UNI administration. These facts establish a continuing pattern of sex-based hostile treatment by Butler that UNI knew or should have known about and failed to investigate or remedy, resulting in ongoing discriminatory harm to female faculty.

33. The discriminatory actions against DeSoto as set forth above including but not limited to intentionally minimizing opportunities for job advancement and favorable job assignments, producing false and harsh written reprimands that served no purpose other than to harass and damage her professional reputation, and then refusing to discuss them, perpetual failures in fairly evaluating DeSoto's performance in his annual reviews. These constitute a

pattern of discrimination that embodies the "continuing violation" theory of discrimination permitting the Defendants to be liable for wrongful acts occurring prior to any statute of limitations cut off date. The record shows that harassment has been ongoing, and it demonstrates that DeSoto's attempts to get help from an unresponsive UNI Title IX/Office of Civil Rights office have been ongoing since at least 2016.

34. A charge of discrimination alleging a continuing violation "will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." *See National R.R. Passenger Corp.*, 536 U.S. 536 U.S. 101, 113, 122 S.Ct. 2061 (2002). (analyzing the continuing violation theory in relation to a hostile work environment claim). The rationale is that the claim is more properly considered as "composed of a series of separate acts that collectively constitute one unlawful employment practice." *Id*. at 117 (quotations omitted).

### C. DeSoto Reengages in UNI Budget Criticism

35. In 2023, in the face of Deans across campus visiting department with threats of additional cuts due to budget shortfalls that would sharply reduce class offerings for students in her department, DeSoto was asked to serve on the key university budget committee. She then provided a presentation on UNI's budget to the UNI's faculty leadership. This presentation pointed out that UNI had cut faculty numbers by 34% since 2012 while the number of administration employees had actually increased by 6%. She showed the faculty leadership that the unrestricted assets possessed (unrestricted net position) by the University had increased recently as well as overall since 2012. Using the audited financial documents of the university, DeSoto showed that UNI's overall financial health had not decreased and did not justify cuts to course offerings that would harm students and faculty alike. Defendants were monitoring this

activity and engaged in a campaign of illegal conduct all designed to drive DeSoto out of the University.

36. The timing of key events herein is highly telling and the exact date matters. On May 8, 2024, Department Head Adam Butler oddly sent two separate and singular emails requesting access to DeSoto's financial presentation slides. DeSoto declined both requests. These slides contained DeSoto's critique of UNI's spending practices, which she had presented to approximately 20 faculty leaders in an hour-long presentation described above. DeSoto's presentation marked her first public fiscal critique of UNI after a decade of restraint. UNI requested her presentation materials *at the exact same time UNI, Gutknecht, Butler, Michelsen, Bilder, and other administrators were actively meeting about, and were conspiring to manufacture, a possible future disability discrimination complaint against DeSoto.*

**D**. **UNI Actively Solicited and Manufactured A Complaint of Disability Discrimination Against DeSoto**

37. In December of 2023 DeSoto and Tiffany Dodd were involved in a policy dispute about who owns copyright of professor created exams, final exam test security, and protecting professors' intellectual properties contained in their exams from being improperly distributed by Dodd's office. Dodd, as part of UNI's Student Accessibility Services (herein "SAS") was the new director and had instituted many changes that are atypical at universities, and that have been widely seen as problematic for both students with disabilities and for faculty trying to accommodate them. The problems were well known and new procedures at SAS had already been the subject of senate meetings and are well documented via student and faculty written testimony. In the context of observed problems with test security within the new SAS office, DeSoto objected to SAS making and retaining copies of her exams and proposed instead to provide tests to SAS office as needed and retrieve them for grading after students had completed

them.  DeSoto wanted to make sure her tests did not get surreptitiously distributed to students, and very much wanted to work with SAS director Dodd to avoid problems.

38. On December 15, 2023, DeSoto wrote Dodd as follows:

Hi Tiffany,

…I would absolutely love to talk. My goal would be to better understand the reasonings for / your rationale for policies, and to gently share some faculty view perceptions and info, and most of all to improve things. I think you have a hard job, and I'd love it so much if I could buy you lunch, or dinner, or holiday appetizers (over wine at Octopus?). And talk about it all….We both want the same thing: to serve students and improve learning. No one wants to make things difficult… I am willing and able to be ultra helpful, and that's what I'd most like.
….
…I'm a caring faculty, who has lots (lots) of experience with disability and section 504 law, I'm a strong advocate for the law and rights of students with disabilities.
…

39. The December 15, 2023, email above was ignored and garnered no response other than internal meetings, discussions, and correspondence which specifically and intentionally excluded DeSoto.  This was done maliciously, with the intent to circumvent both informal resolution and formal resolution that UNI Policy states are available to faculty.

40. Throughout the semester, DeSoto acted in good faith, making repeated efforts to resolve the matter through university rules and informal, professional communication, specifically attempting to engage SAS Director Dodd, as SAS written policy at the time directed (faculty were told via the SAS Faculty Handbook to talk to Dodd if there was a problem or concern with SAS procedures). Despite these efforts, Dodd refused to communicate with DeSoto, in violation of SAS's formally stated policy requiring engagement when faculty raise testing concerns. Dodd refused to communicate because of being formally instructed not to communicate with DeSoto by Vallentine, Bilder, Gutknecht, Butler and others. This conduct was undertaken pursuant to a coordinated plan to circumvent established university policies and to

generate a pretextual complaint against DeSoto for the purpose of forcing her separation from the University.

42. Concrete examples of the security problems that were a concern to UNI Faculty included SAS mailing incorrect tests to faculty, maintaining an unorganized file system, leaving a copy of a final exam accessible to students, and allowing student workers unsupervised access with the ability to copy and distribute exams. The issue persisted even while DeSoto attempted to raise issues of copyright, and to present her concerns to the Faculty Petition Committee, but again, she was blocked from doing so.

42. The Faculty Handbook establishes a "Faculty Petition Committee" ("FPC") to provide faculty with an internal process to address violations or misapplications of university policy. DeSoto repeatedly attempted to invoke this process—including to compel the Student Accessibility Services ("SAS") office to communicate with her regarding exam safety and copyright concerns during early 2024—but administration, especially John Vallentine who was then Associate Provost, blocked her efforts, informally conveying they would not allow it to be heard. In practice, upper administration has improperly assumed discretion to decide which petitions will be heard, a practice expressly criticized in a national AAUP advisory letters (See Exhibit B, attached hereto and incorporated herein).

43. The absence of appeal, hearing, and petition rights is a core feature of the factual record in this case. Plaintiff alleges that these rights were intentionally and repeatedly denied over a multi-year period, contrary to established due-process protections and unambiguous University policy. Denying DeSoto proper access to the Faculty Petition Committee caused DeSoto unnecessary stress and wasted her time, amounting to harassment. It further demonstrates not only the university's obstruction of the Faculty Petition process, aided by

Bilder and Dodd, but also its deliberate and ongoing refusal to afford DeSoto basic due process.

Key Faculty Handbook Passages (faculty_handbook.pdf)  include:

> *Section 12.0 Policy Statement*
> The procedures in this Chapter are intended to provide a fair internal process for resolving disputes that arise relating to the interpretation and implementation of the provisions of this Faculty Handbook and any formally adopted university, college, department, or PAC policy/procedure.  The procedures discussed in this Chapter are intended to provide, to the maximum extent possible, an informal mechanism for addressing such disputes. The procedures contained in this Chapter are not to be used to challenge the desirability of policies and procedures provided by this Faculty Handbook or any formally adopted university, college, department, or PAC policy/procedure.
>
> *Section 12.1 Scope*
> A "Faculty Petition" for purposes of this Chapter is an allegation by a faculty member that there has been a violation, misinterpretation, or misapplication of any provision of this Faculty Handbook or any formally adopted University, College, department, or PAC policy/procedure, except as noted below…..
> *Subdivision 12.3d*
> Meetings of the FPC Upon presentation of a Faculty Petition to the FPC or one of its members or at the request of an FPC member, the FPC **shall** convene to discuss the Faculty Petition within fifteen (15) days.

44. Simultaneously with the deliberate obstruction of the Faculty Petition process, Nielsen, John Valentine, and others further impeded resolution of the SAS test-security issue by meeting with Tiffany Dodd and others and advising Dodd not to meet with or engage DeSoto. Plaintiff alleges that before SAS Director Tiffany Dodd ultimately reached out to and contacted the student, she was advised to avoid problem-solving the issue with DeSoto. This is significant because Plaintiff alleges that these actions were part of a premeditated plan to harm DeSoto through the student-complaint process, and that, in furtherance of that plan, virtually all procedural and due-process safeguards were set aside and violated.

45. Various individuals, including but not limited to Butler, Nielsen, and Dodd, coordinated the fallout while using their authority to prevent accurate information regarding DeSoto's position from reaching the student. Nielsen specifically and personally instructed

DeSoto not to contact the student and exercised her authority to require other faculty to comply, thereby intentionally obstructing communication that would have corrected false impressions and facilitating the advancement of a complaint initiated under false pretenses. Dodd specifically and personally provided the student with false information. Butler, Gutknecht, Bass, and Bilder—and possibly others—participated in the planning and execution of efforts to prevent accurate information from reaching the student.

46. UNI and multiple individual Defendants misused the Title IX process to target and harass a faculty member for protected speech. This misuse of process was undertaken in retaliation for DeSoto's reporting of gender-based discrimination by Butler; her assertion of copyright and exam-security concerns involving Dodd; and her activism and public criticism of university budgeting practices that harm students and the educational mission of the University, including actions by Bilder, Butler, Nook, Herrera, Nielsen, Bass, and Gutknecht.

47. On March 1, 2024, SAS granted mid-semester disability accommodations for a student (herein "the Student) in one of DeSoto's classes.

48. The Student self-selected to take a make-up of her missed Exam 2 on Wednesday, March 26, 2024, with DeSoto. No issues were reported to DeSoto. The Student did not mention or hint at any complaints or concerns about taking the exam before, during, or after taking the exam on March 26, 2024.

49. On April 16, 2024, DeSoto sent another email to Dodd setting forth her objections to SAS retaining and copying her copyrighted exams and the absence of test security.

50. On April 21, 2024, Dodd emailed DeSoto and advised that the SAS policy was to retain and copy the exams during the school year, but they would now destroy them at the end of

the academic year. No reason or explanation was given for the need for copying of retention of the exam questions.

51. On April 24, 2024. Prof. DeSoto again followed up and wrote to Dodd about the issue stating, "That's good. If I ever have a student taking exams there [SAS] again, I do not want any copy made at all or kept as e/version etc. even temporarily. I'll drop test off and then pick it up. Thanks so much. Have a great day. Cathy"

52. This April 2024, email neither garnered a response nor an objection from Dodd or SAS. There was considerable communication and planning by Butler, Dodd and others happening at this time. DeSoto, for her part, had no ability to comprehend that there was an objection to her email, nor did she have any reason to believe that her request would not be honored. DeSoto did not know that Dodd was specifically instructed to *refuse to respond to DeSoto's email and purposely leave her in the dark*. Based on information and belief to be proven upon further discovery, the instruction to Dodd not to respond to DeSoto came from Butler, Bilder, and others.[3]

53. Dodd maintained a "notebook" documenting her regular communications with Butler. Based on information and belief, the instruction not to respond originated from one or more of the Defendants Butler, Gutknecht, Bilder, Bass, Vallentine or others at UNI as part of a conspiratorial effort to ensnare DeSoto in false claims of disability discrimination.

54. May 6, 2024 – DeSoto hand carried her final exam to SAS office, as she normally would. Unbeknownst to DeSoto, Dodd still planned to make both a photocopy and a digital copy of the entire exam—a premeditated action she anticipated would antagonize DeSoto.

---

[3] Dodd has admitted in transcribed interviews belatedly provided to Desoto as well as a recording that she was **instructed** not to communicate with DeSoto, she has not yet been able to be questioned as to who gave the instruction.

Singularly, Dodd has asked her secretary to alert when DeSoto arrived. DeSoto was incredulous and asked Dodd, "Why then did you not respond to any of my emails trying to resolve this problem?" Dodd responded, "I was told not to." A recording of this exchange exists. Dodd's course of action was decided during multiple conversations and planning sessions involving some combination of UNI administration such as Butler, Dodd, Vallentine, Gutknecht and others. Upon information and belief these conversations will further prove the plan to falsely frame DeSoto for disability discrimination with the intent to ultimately have DeSoto removed from the University. DeSoto left SAS with Final Exam. Based on belatedly provided transcripts of interviews, we now know there were already meetings happening at this time and that Dodd pre-planned how to respond to DeSoto, and then to mislead a student.

55. May 7, 2024 – (Day before final exam) DeSoto offered to hand-deliver and retrieve the exam so that SAS office it could be administered. DeSoto sent email clarifying she did not mind office copying student response sheet and/or their written essay (which are not on the exam question packet). She was hopeful this would suffice and or at least result in some communication. But the May 7, 2024, email from DeSoto to Dodd purposely received *no response from Dodd.* The May 7, 2024, email is set forth below:

From: **Catherine Desoto** <cathy.desoto@uni.edu>
Date: Tue, May 7, 2024 at 6:36 PM
Subject: Re: Student Exam
To: Tiffany Dodd <tiffany.dodd@uni.edu>
Cc: Christopher Martin <christopher.martin@uni.edu>, Fernando Herrera Calderón <fernando.h.calderon@uni.edu>

Hi Tiffany,
I'd be glad to drop it off. I just need your assurance you will honor my intellectual property. Perhaps we do not have a problem: You can copy the scan sheet. It is the wording of the questions, that rely on my educational background and intellect, that is copyrighted. There is no reason you cannot proctor the test for me, and then I'd pick it up right afterwards. I am trying to make this work, and am willing to walk the exam from across campus before and after to avoid problems. I am open to lots of things, but as I have said and tried to explain earlier in the semester, I do object to your office making a copy of my test questions.
Are we in agreement?
On Tuesday, May 7, 2024, Tiffany Dodd <tiffany.dodd@uni.edu> wrote:
  Hi Catharine,

  If you would like to drop your exam off tomorrow before Alexis tests at 8:30, you are more than welcome to. If we do not have the test, we will work to reschedule Alexis to Thursday.

  Thanks,

  Tiffany

  --
  **Tiffany Dodd, M.S., ADAC** *(she/her)*
  **Assistant Dean of Students - Student Accessibility Services**

56. In an email to the Student on May 7, 2024, DeSoto, as a direct result of having received no response to her questions about exam security from SAS or Dodd, and after being ambushed at the SAS office about exam security issues, emailed the student and told the student that there an unspecified problem getting the exam to SAS and gave the student the option to take the exam with the rest of the students as scheduled and that DeSoto would give her all the extended time she needed, *or* that she could contact DeSoto for other options (that would have included extra disability accommodation or testing at SAS). DeSoto specifically advised that she was "open to her [the Student's'] thoughts" on the matter and that taking the exam with the rest of the class *was only one of the options available to the student*. The Student was advised to let DeSoto know what she wanted to do.

57. The Student replied to DeSoto's May 7, 2024, email on May 8, 2024, as follows: "I just saw this email, but I'm going to just show up to class by 8:30 to take the exam."

58. On May 8, 2024, at 8:30 a.m. the Student, without objection or comment, began the exam with DeSoto, with extra time as desired after, in a quiet location (which was about an extra hour). The student was pleasant, told DeSoto of her shift in major, and asked a question during the extended time portion of the exam.

59. On May 8, 2024, Dodd apriori planned to meet the Student and planned to fraudulently advise the Student that SAS was ready to proctor it, but that DeSoto did not want her to take it with SAS and refused to provide it. This is not conjecture; it is discernable from investigative interview transcripts and emails belatedly provided to DeSoto. When the student did not show up, Dodd and others consulted among themselves and shifted their plan. They called the Student and Dodd fraudulently told the student there was no problem and they were ready and willing to give the exam. They were fully aware they were misleading the student. For

example, on June 5, Dodd admits she told the student it was not accurate when Dodd told the student "we were set up and ready to give the exam." Dodd admitted that she lied by omission and that SAS did not actually have the exam, and they gave the impression to the student that that they did.

60. In the afternoon of May 8, 2024, Dodd called the Student and told her that her disability rights were violated, and Dodd either on this day or the following falsely conveyed to her that DeSoto dislikes students with disabilities and does not want to accommodate them. Further, Dodd told the Student that the Student could take the exact same exam she had taken earlier that morning with SAS the next day on May 9, 2024, at 1:00 p.m., with all the time she wanted, even with the same Essay question from the test already taken that day. The student was incredulous, but accepted what she was told at face value.  Student said, "You mean I can take the exact same test with the same essay question?"  Dodd promised this was true.

61. During all of this, Dodd was actively communicating with Butler and others, On May 9, 2024, after the Student had already taken the final exam (which Dodd already knew), Dodd wrote Butler at 8:14 a.m. and stated:

> On Thu, May 9, 2024 at 8:14 AM Tiffany Dodd <tiffany.dodd@uni.edu> wrote:
> Good Morning Adam,
>
> I did not receive a test from Cathy in digital or hard copy format.  The student is scheduled to test at 1:00 today.
> Please let me know how I can assist in any next steps.
>
> Thank you,
>
> Tiffnay

62. Knowing that Dodd *purposely* made no effort to work with or respond to DeSoto after DeSoto's December 15, 2023, April 24, 2024, and May 7,2024, emails *at Defendant's specific request*, the above email from Dodd to Butler (not DeSoto) is explicit evidence of the "plan" to ensnare DeSoto in a manufactured disability discrimination complaint as it specifically references the "next steps" to be taken even though Dodd knew the student had already taken the

test. The word "plan" was also used by Dodd in her own descriptions of how to engage the student. By the time Dodd wrote the email to Butler for "next steps," the student had already taken the exam, *which Dodd already knew*. There was an original plan, and then a new plan. At each step the "plan" was centered on the goals of getting the student to file a complaint against DeSoto.

63. The student did not contact anyone to complain (which is what UNI policy explicitly requires of SAS students who feel their accommodations are not satisfactory).

64. ***At all times the Defendants prevented any communication from DeSoto and the Student*** – this was required so that they could paint a false picture and entice the student to file a formal disability discrimination complaint. The Student unwittingly foiled parts of the plan when she took the exam with DeSoto and the rest of her class on May 8, 2024.

65. DeSoto at no point had any objection to the student taking the exam with SAS, stated this to Dodd multiple times in words and actions, and would have not objected to allowing the student retake the exam in SAS had she known this was the Student's desire (albeit with an alternate essay question).

66. On the morning of May 9, 2024, Butler phoned DeSoto angrily demanding a copy of the exam and threatened sanctions against DeSoto. The student had already taken the test without complaint. and DeSoto did not know Dodd had reached out to the student and was telling the student false narratives. DeSoto, upon hearing Butler's tone and threatening words, invoked her *Weingarten Rights*.[4] DeSoto told Butler that she wanted Chris Martin, the United

---

[4] *Weingarten* rights arise from the United States Supreme Court decision in *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251 (1971) and concern a union employee's right to have a union representation at investigatory interviews. DeSoto has expertise in *Weingarten* rights, having previously won in formal arbitration against UNI on this very point when representing faculty as union president. It is inconceivable she would not have invoked them.

Faculty president, present before continuing the conversation with Butler. As a former faculty union president, DeSoto has professional training and expertise in *Weingarten* rights, and her request for representation was entirely appropriate under the circumstances as she had been threatened by formal sanction by Butler. Butler was infuriated. Dr. DeSoto's invocation of *Weingarten* rights was both disregarded and later used against her (as detailed below).

67. Butler then contacted Vallentine to formally complain about DeSoto's failure to provide the Student's final exam as he demanded. Vallentine was advised that matters were urgent because the Student was planning on leaving campus that very day.

68. Vallentine summoned both DeSoto and Christopher Martin (President of United Faculty) (herein "Martin") to his office. In a May 9, 2024, email at 11:02 a.m., Vallentine demanded that DeSoto bring a copy of the test and advised that there would be discussion of "accommodations and possibly aspects of Chapter 11 in the Faculty Handbook (sanctions) and that University counsel (Bilder) would be present."

69. Martin quickly responded that Valentine did not have all the information, that the student had already taken the test and reiterated in an email, "The problem advanced by Cathy earlier this semester, which is now more an issue, is relatively simple: that the UNI SAS office should not copy or maintain physical or digital archives of tests given to the office for student testing services. The SAS office's practice of doing this is a local practice that conflicts with both UNI policy and AAUP guidelines on copyright, and is not a practice required for ADA compliance. Cathy has not been able to get a confirmation from the SAS office that they will not copy or archive her exams — in fact she reports that the SAS officer said they *would* copy the exam — and that has been her concern."

70. Vallentine then cancelled the meeting. After the cancelled meeting, Martin reported to DeSoto that the incident had "deescalated" and he was working getting the University to address the issues surrounding exam security at SAS. Numerous emails were sent in further attempts to resolve the exam security issue, (those emails were also ignored by UNI).

71. UNI, Butler, Dodd, Neilson, Gutknecht, Michelsen, Bilder, Bass and others were biased against DeSoto and working against her to manufacture a disability discrimination complaint. UNI, Butler, Bilder, Neilson, Gutknecht, Bass and Dodd conspired to mislead the Student and falsely told the Student: (1) the only way to improve her grade was to file a formal complaint of disability discrimination; (2) to avoid any informal or formal procedure to change her grade through the official process set forth below in process 12.01); (3) that DeSoto harbors a personal dislike for students with disabilities and DeSoto sought to undermine her rights to accommodation; (4) that at the time of grading DeSoto specifically knew that the Student had filed a disability complaint against her and graded her exam with this knowledge; (5) that DeSoto was not interested in informally speaking with the student to resolve any grievances or potential disputes. The above false statements to the Student were in total contravention of Title IX policy -13.02 and Academic Policy 12.01 governing grade changes and were made knowingly and intentionally, despite Defendants' awareness that those statements were false.

72. On May 14, 2024, Michelsen, under the direction of others, emailed the Student and again re-urged the Student to consider filing an OCRC disability complaint against DeSoto, and offering to help. Michelsen wrote: "I wanted to follow up with you from our meeting last week, do you have any questions on how to pursue Policy 13.02 (formal disability complaint against DeSoto)?" The Student did not respond.

73. Based on information turned over after the first appeal, it is already known that the Student considered filing an academic grievance under proper established UNI policy, which includes a hearing board and would ensure Professor DeSoto would have been informed about the grade dispute and would have allowed DeSoto to resolve the grade dispute, making the disability discrimination complaint moot. However, the Student was advised *not* to pursue an academic grievance that would allow information from DeSoto top reach to reach the Student. Defendants, and each of them, knew that if the student had utilized Policy 12.01, DeSoto would have been informed and there would have been direct communication—something they were highly motivated to prevent for their plan to succeed. Instead, these Defendants intentionally misled the Student into believing that the only way to improve her grade was through a formal disability discrimination complaint. In truth, DeSoto would have done everything possible to help the Student meet the course objectives and successfully complete the class.

74. The Student was apparently told that if they could together secure a "guilty verdict," it would automatically trigger a grade change. This is confirmed by two key facts:

a. November 27, 2024 – the Student email Adam Butler, and asked that now that DeSoto had been found guilty – can she have her grade changed, "*since there was a guilty verdict…*"

b. The Student's grade was administratively changed in secret, without following any known or valid UNI policy or notification to DeSoto.

75. The Student also wrote in the email to Butler that she had become aware she had been "misled and could have filed (the grade appeal) jointly with the complaint." This statement confirms Student was intentionally misled regarding her procedural options, creating the false impression that filing a formal disability discrimination complaint was her only path her requested grade change. The inference is clear: Butler, Dodd, Bilder, Nielson, Gutknecht,

Michelsen, Bass and others manipulated the Student to bypass normal grievance procedures, manufacture a discrimination finding, and prevent direct communication with DeSoto, who otherwise would have supported the Student.

76. The UNI policy pertaining to grade changes is well known and published at UNI as policy 12.01. The policy states:

"A student who feels academically aggrieved because of something that a faculty member has or has not done *shall* make every reasonable effort to resolve the grievance informally with the faculty member."

1. The student *must* inform the faculty member of his/her grievance in writing, via electronic communication, within ten days of the first day of the semester following the semester or summer session in which the alleged offense occurred.

2. The faculty member *must* respond within ten days from the date of notification of the grievance is sent by the student unless both the student and the faculty member agree in writing to continue the informal process.

77. The grade change illustrates both a systemic procedural violation and direct harm to academic freedom that affects all faculty and students. The governing policy is clear and comprehensive, reflecting the central role that the assignment of grades plays in the academic mission of the University. Policy 12.01 expressly addresses all circumstances under which grades may be changed, including a a separate section of Policy 12.01 that specifically governs instances involving a concurrent policy 13.02 complaint. Those policies were not followed either. No university policy permits administration to change a faculty member's grade without the faculty member's knowledge or involvement, except under highly exceptional circumstances, such as the death or total incapacitation of the professor, as outlined in the "Administrative Grade Change Policy" (policy 12.01).

78. Further, the Student did not provide evidence that she met the course learning objectives; in fact, she provided evidence that she did not. Awarding a passing grade under these

circumstances is inconsistent with academic integrity and unfair to other students who met the requirements. Only two students failed this class. The other student subsequently retook the course and can testify to the substantial effort required to master the material and achieve the learning objectives. That student will also confirm that DeSoto, as with all students, provided guidance and support throughout the course, which would have been available to the complaining Student in either a retake of the class or the final exam. Altering a grade of the facuty of record as was done would be a dangerous precedent. It violates fundamental academic norms and professional standards, contravening the 1940 AAUP Statement on Academic Freedom, which UNI and virtually all universities in the United States recognize. Such actions undermine both the integrity of the academic process and the university's legal and ethical obligations it purports to uphold.

79. The Student received her course grade on or about May 15, 2024. She received a failing grade on the final exam and a "D" for her course grade based on her performance and the point allocations described in the course syllabus. Because she had declared as a Psychology Major, the "D" grade would not count as credit towards her major.

80. On May 16, 2024, upon notification that her final course grade was a "D." The Student expressed in an email that she was unhappy with her final exam grade and her course grade. She was in contact with Butler, SAS, and OCRC during the period following her exam. Based on information and belief, once she found out her grade she contacted Butler, Dodd, and OCRC she was finally convinced to file a formal complaint.

81. On May 17, 2024, the Student submitted a formal complaint without DeSoto having any notice that the Student was claiming dissatisfaction with her accommodations and requested a grade "adjustment." The complaint alleged that DeSoto (based on communications

identified above) had negative personal views of those with disabilities and that her poor grade was a "subjective to (DeSoto's opinions of me." Her complaint wrongly alleged that DeSoto was somehow informed of the potential disability discrimination complaint before she submitted the Student's final grade. The Student was purposely fed false information about DeSoto's prior knowledge of the complaint by UNI, Butler, Gutknecht, Michelsen, Dodd and others in order to support their plan to frame DeSoto for disability discrimination.

82. Prior to receiving notice on May 23, 2024, DeSoto had no idea that a complaint alleging disability discrimination was brewing against her.

83. Instead of following the process set forth in Process 13.02 of UNI's discrimination policy, Butler, Gutknecht, Michelesen, Bass, Neilson, and Bilder purposely dissuaded the Student from any type of informal resolution in as set forth in 13.02(2) (informal resolution"). Based on now provided emails the Student expressly indicated that she had wondered if it would be possible and had originally wanted to work with DeSoto concerning her test score and possibly retaking some of her tests. UNI, Butler, Dodd, Neilson, Gutknecht, Bilder, and White purposely dissuaded the Student from any interaction with DeSoto knowing that if the two did connect, the matters would have been worked out.

84. In a June 24, 2024, conversation with the Student, White, acting in accordance with UNI, Butler, Gutknecht, Dodd, Neilson and Michelsen, *specifically told the Student, in response to the Student's inquiries, that the Student should not pursue a grievance pursuant to Policy 12.01 and she should only pursue the Disability Discrimination complaint*. The repeated purposeful misleading of the Student was part of a plan to frame DeSoto for disability discrimination orchestrated by UNI, Butler, Gutknecht, Bass, Bilder, Michelsen and others.

85. DeSoto from first learning there was a problem, indicated that she would work amicably with the Student to resolve any problems. She was purposely never given the opportunity by Nook, Butler, Bilder, Gutknecht, Dodd, Michelsen, and others who conspired to make sure that the Student and DeSoto did not discuss matters together. DeSoto specifically complained that she was denied any chance at informal resolution.

86. The OCRC, Butler, Dodd, Gutknecht, Bilder, and others conspired to make false statements to the Student to purposely mislead the Student away from the grievance policy – 12.01 in ¶ 64 and purposely falsely advised her that the only policy available to change her grade was through the filing of a formal disability discrimination complaint with OCRC.

87. The Student wanted to follow UNI academic policy but was specifically told not to do so by White, Butler, Dodd, and others all working together with the other Defendants, and each of them.

**E.      The Formal Disability Discrimination Complaint Against DeSoto**

88. In an email dated May 17, 2024, that UNI, Gutknecht, Butler, Bilder, Michelsen, Bilder and others used to draft the formal complaint, the Student wrote, "*The situation was attempted to be remedied to the extent of my knowledge by the Psychology Department Head Adam Butler, Tiffany Dodd from SAS, and a few other superiors.*" This was not only false but any such "attempted remedy" had been purposely thwarted by UNI, Butler, Gutknecht, Dodd, Michelsen, Bass and others.

89. Ultimately, the complaint falsely claimed that DeSoto wrote the Student an email that *required* the Student to take the final exam with the other students and outside of the SAS office. This was not true, there is no evidence this is true, and direct written evidence this is false.

90. The Complaint falsely characterized a single March 23, 2024, after a missed exam, as as "multiple emails urging me to take the exam with her on Wednesday March 27" there are no emails that can be produced that support this statement. It is false.

91. The Complaint falsely states the DeSoto demanded to be notified by the Student of SAS accommodation in advance. She wrote "DeSoto wrote that it is required for me to come to her before an exam." This statement is false as the email notifies the Student only that DeSoto and all teachers need to know , *prior to any test and not after the test*, that SAS accommodation will be used.[5] The notice for the 'accommodations' of the test came after the test had passed, after the student missed the exam 2, and when DeSoto was out of state for the weekend.

92. The complaint ultimately filed falsely claimed that DeSoto demanded that the Student take the make-up for exam 2 with DeSoto. The email from DeSoto clearly refutes this. . In fact, the Student complaint misleadingly did not mention that the Student had missed Exam 2 in the first place and only contacted SAS after the exam had been given to the rest of the class. This omission was deliberately relied upon throughout the complaint process in reckless disregard of the truth, while opposing evidence refuting the allegation was excluded from consideration.

---

[5] DeSoto had an express policy on make-up exams that was provided to the Student at the beginning of the semester. The policy stated:

**Makeup Exam Policy:** Missing class on an exam day is STRONGLY discouraged. Students who must miss for a school-sponsored event or military-duty can arrange for their exam make-up PRIOR to the exam date. If you must miss for Covid-19, a make-up exam will be arranged. Other requests for make-ups are at the discretion of the instructor - I can and do say no. Requests from students who are making satisfactory progress in the course and attend regularly will be considered. Make-Up exams are typically essay format.

93.     The Student falsely accused DeSoto of dishonesty and intentional creating a hostile environment stating that DeSoto's written and physical conduct that was "pervasive and objectively offensive." Prof. DeSoto offered letters, evidence, and witnesses including students, faculty and at least one administrator that asking students if they want to take their exams with SAS is not only common, but necessary, and certainly the clear norm in both her department and at the university.  This omission was deliberately relied upon throughout the complaint process in reckless disregard of the truth, while extensive evidence refuting any claim of pervasive or hostile conduct was excluded from consideration. None of DeSoto's evidence was considered or used by either White, as investigator, or Hughes as the Decision Maker. used. None of the student or faculty witnesses were contacted or questioned.

94.     UNI, Gutknecht, White Michelsen, and others ultimately crafted the Student's email into a formal complaint that was signed by the Student on May 21, 2024.

95.     The first allegation of the formal complaint is as follows:

> **Allegation #1**: *As part of Complainant's approved accommodations, Complainant was scheduled to take Exam 2 with SAS rather than in the classroom. On or around March 23, 2024, multiple emails were exchanged between Respondent and Complainant where Respondent urged Complainant to take Exam 2 with Respondent instead of with SAS. Complainant did as Respondent requested and changed her plans in order to take the exam with Respondent.*

96.     The first allegation accused DeSoto of engaging in disability discrimination and discriminatory harassment alleging that Complainant was scheduled to take Exam 2 (which had been in March of 2024) with SAS rather than in class. The complaint further states that multiple emails were exchanged between the Student and DeSoto wherein DeSoto urged the Student to take the exam without SAS.

97.     The first allegation is patently false. There was only one email.. The Student only attempted to make such plans *after she missed the March exam*. The Student falsely claimed that

DeSoto wrote in the email, "OK, I'll just have you take it [March Exam] with me. This statement is patently false. DeSoto did not urge the Student to take the March exam with DeSoto. The *single* email is as follows and speaks for itself:

Hi
I just received a notice that you want to take your exam in SAS office Monday. It is important, regardless of what SAS office conveys, that you make sure professors know your intentions - that you have an accommodation and want to use it. This was the standard until a couple of years ago, and it can create problems when this step is not done.
Many students have accommodations, and don't use them. Some students don't want to use them (so practically speaking, having them does not convey to your professors they will necessarily be used, or they could miss a single email) . It's just a courtesy (and needed) to talk to your professors about your accommodations.
 Here, I am not physically on campus, and won't be Monday. If I had known this was going to be requested even by Thursday, I could have gotten test there etc.
I can't guarantee test will be there Monday. I have just ⁺his minute received the email sent Friday. (It's 12:30 am Saturday) before the accommodation scheduled for Monday (for a test given last Thursday, Mar 21).
This is an unnecessary stressor for both of us, fully avoidable with just a quick two or three minute conversation after class or during my office hours. We can have even gave a quick phone call. :)
Because of the special situation, I will/can give you the test myself on Wednesday. Or I can find a way to give it to you Tuesday. But I'm not back in town until Monday at about 4 pm. Let me know if you'd like to take the test with me on Wednesday, or if you'd like to are able to reschedule with SAS for Tuesday or Wednesday. However- You'll need to take it before class time Thursday,  because I'll give it back that day. Otherwise I'll have to make a different exam for you.
 Most professors want to help students, and it's always  best to let your teachers, who are seeing you day to day, know  that you have and want to use your accommodation. Communication on this really is needed.
Let me know, I'll check email Tomorrow and Monday. Please do the same in case I am able to find a way to get the test there by Monday. If I can reach a secretary Monday morning, it might be possible.
Your thoughts are welcome, let me know.

98.     The second allegation of the Complaint Reads as Follows:

> **Allegation #2**: "On or about March 27m 2024, Complainant took Exam 2 [March Exam] in a common area of Bartlett Hall with a Teaching Assistant, neither of which were in alignment with her approved accommodations."

The second allegations asserts that the March exam was not taken at SAS. While technically correct there was clearly no disability discrimination and there certainly was not discriminatory harassment as set forth above. The student chose to take the exam with DeSoto knowing she had other options. She did not timely request SAS accommodations. She missed the original exam. DeSoto explicitly offered to get Exam 2 to SAS on Tuesday so she could take the Makeup test there if that was her desire. A student with SAS accommodation taking an exam in such a location was common and standard at UNI and in her department, and the student could and would have taken it within SAS offices had the Student not stated (in writing) that it was her preference to take it with DeSoto on Wednesday. Shown below is a standard form used by the Psychology Department for at least a decade to document SAS-accommodated exams

administered in departmental office space or hallways; hundreds of such records exist, which were later removed from departmental custody by Butler and not produced.



99.     The third allegation reads as follows:

**Allegation #3**: *On or around March 26, 2024, Respondent ignored Complainant's request for additional notes from PowerPoint slides which was one of Complainant's approved accommodations.*

100.    The third allegation concerns requests for copies of notes and materials for the March exam which were requested *five days after the exam occurred*. The request was not timely and was not ignored. There was clearly no disability discrimination and there most certainly was no discriminatory harassment. The Student's request came a day before the re-scheduled March exam. DeSoto stated she did not see the email before the test, and discovery will show this is true. Further the Student saw DeSoto the same day as her email request but made no mention of the need or any question to DeSoto. Further the Student already had all of the requested slides she complains were withheld. Further DeSoto had requested her TA use some of her hours to try and tutor the student individually to help her after few absences.

101.    Allegation four reads as follows:

**Allegation #4**: *On or around April 16, 2024, Respondent expressed to Complainant her dislike of SAS, shared she did not want Complainant to take Exam 3 with SAS, and discouraged Complainant from using her accommodations for testing. As a result, Complainant took Exam 3 without the benefit of her accommodations.*

102. The allegation that Prof. DeSoto discouraged the student from using the SAS office is false and was always contradicted by the record. This incident refers to a conversation between Prof. DeSoto and the student following a class-based review session for the upcoming Exam 3. During that exchange, the student stated that she wanted to take Exam 3 in the SAS office. Prof. DeSoto responded that, while she appreciated the student speaking with her, it might be too late to schedule through SAS, which typically requires more than two days' advance notice, and urged the student to immediately contact SAS. The only statement that could be construed as disparaging was the accurate observation that it is difficult to obtain SAS scheduling so close to an exam date. Prof. DeSoto's concern was that the student would not be able to secure a timely accommodation, and she observed that the student was confused about the steps in the SAS testing registration process.

103. The records at all times demonstrated that the student later acknowledged she had been confused, which underscores SAS's repeated failure to fulfill its basic duty of explaining to students with disabilities how to register for accommodated exams. The records always showed that Prof. DeSoto went beyond her responsibilities by emailing SAS staff member Dodd shortly after the conversation to assist the student and alert SAS to the student's confusion, specifically requesting that SAS reach out to the student to get her scheduled with SAS. Professor DeSoto of her own accord emailed SAS director Tiffany Dodd to alert her that this Student wanted to schedule with SAS and requested that Dodd assist the student. Neither SAS nor Dodd followed through. As a result, the student did not register with SAS and therefore did not take Exam 3 in

the SAS office. These facts directly contradict the claim that Prof. DeSoto discouraged the student and demonstrate that the finding of discrimination was always without factual basis.

104. The investigation by Brenda White omitted or downplayed basic exculpatory facts—illustrating the bias and predetermined nature of the process. Although this allegation was ultimately resolved as "not guilty," the report itself disregarded the evidence in Prof. DeSoto's favor, consistent with the broader pattern of a process designed to reach an adverse outcome. Taken together, these facts demonstrate that exculpatory evidence was known, documented, and available throughout the process, yet was omitted or minimized in a manner consistent with a predetermined outcome.

105. The fifth allegation reads as follows:

> **Allegation #5**: *On or around May 8, 2024, Complainant was scheduled to take the Final Exam with SAS. Early that morning just prior to the class exam time, Complainant received an email from Respondent stating there was a problem with SAS that was unable to be resolved and that Complainant had the option to take the Final Exam with the class. Complainant went to class rather than SAS to take the Final Exam. While taking the Final Exam with the class, Complainant was not provided her accommodations and claims Respondent's actions that morning created a hostile environment for Complainant.*

106. The allegation implies that DeSoto wanted the student to take the Final Exam with her. This is patently untrue. To be clear: SAS failures throughout the semester caused the problem, and it appears that it was a premeditated set up that set the interests of the Student aside. The Student's interests were at the front of DeSoto's decision as at every step including the emails trying to get SAS to respond which were all ignored, and the attempts to use the Faculty Petition Committee to resolve the copyright/security issue, which were blocked by administration. Here are words from the emails sent to the student from DeSoto, "There is a problem I am unable to resolve with SAS, If you'd like to start the exam with the class, I will provide you all the extra time you need after. …..It's totally up to you…this is an option." The

Student came and took her final exam with the class and then had at least another hour after to finish, in a quiet location. As shown above, the student specifically chose to take the final exam with the rest of her class. DeSoto clearly expressed to the Student that taking the exam with the class was only *one* of *several potential options* for the Student. There was  no disability discrimination and there most certainly was no discriminatory harassment. The student gave no indication in facial expression, voice tone, words or body language that anything whatsoever was not satisfactory. Despite its central relevance, the investigation did not address the copyright and exam-security requirements that constrained DeSoto's actions, nor the fact that she attempted to provide the exam to SAS for administration, resulting in findings untethered from the governing facts.

107.    Allegation 6 reads as follows:

**Allegation #6**: *Following the Final Exam, Complainant responded to messages she had received from SAS about missing her exam time that morning. SAS and Complainant scheduled a retake of the Final Exam to be taken with SAS on May 9, 2024, so Complainant could utilize her accommodations. Respondent did not provide SAS with the Final Exam as requested and Complainant was unable to retake the exam while utilizing her accommodations.*

108.    The sixth allegation claimed: "SAS and (Student) scheduled a retake of the final exam to be taken with SAS on May 9 so the student could use her accommodations. DeSoto did not provide SAS with the Final Exam as requested…" This allegation was ultimately dismissed, but only after subjecting DeSoto to the stigma of yet another baseless charge. Critically, the report omitted the central facts that (a) Prof. DeSoto had not been informed the student was seeking to retake the exam, and (b) SAS staff member Dodd acted without authority in offering the student a retake of the identical exam she had already completed, which would have given her improper advance knowledge of questions and essay prompts unavailable to other students. The willingness to level such a charge while ignoring these basic facts demonstrates bad faith, as

well as an investigative process more focused on generating allegations than on applying policy or ensuring fairness.

109. The seventh allegation reads as follows:

**Allegation #7**: *Complainant received a D for the course and saw her Final Exam grade was not entered. Complainant alleges that because she exercised her right to receive accommodations, her course grade was negatively impacted by Respondent.*

110. This allegation was ultimately dismissed. However, it must be emphasized there was never any evidence whatsoever to support this claim. The record demonstrates that the student's belief in this allegation was implanted by SAS staff and other UNI administrators, rather than arising organically. DeSoto did not even know she was dissatisfied, but the Student was apparently told the contrary to get her to file the complaint.

111. Before the student was ever contacted on May 8, 2024, multiple UNI Administrators were already meeting. A non-exhaustive summary of the communications presently known, based on witness admissions and interview materials produced only after appeal, is set forth below. These communications involve, among others, SAS Director Tiffany Dodd, Associate Provost Brenda Bass, Department Head Adam Butler, University counsel Ann Bilder, and Title IX Coordinator Leah Gutknecht, and include one or more Zoom meetings during the relevant week. All quoted statements in the "How Known" column are verbatim excerpts from SAS Director Tiffany Dodd's June 5, 2024 recorded interview transcript. As reflected in those admissions, the communications demonstrate advance planning rather than confusion, including instructions that Dodd not engage with Dr. DeSoto's repeated efforts to resolve the SAS test-security issue—efforts that included an email from DeSoto sent just hours before the Student was contacted -- in which DeSoto requested to hand-deliver the exam to the SAS office so they could administer it.

| Event / Coordination | How Known (with key quotes from June 5, 2024 interview) |
|---|---|
| **January to April 2024:** Dodd notes she ignored Dr. DeSoto's attempts to resolve SAS test-security issues | (minute mark ~32:44). Dodd: *"I didn't respond… I was told not to."* |
| **Monday, May 6, 2024:** Dodd and SAS staff anticipated Dr. DeSoto's arrival and were waiting for her. | Dodd stated she was * *"already aware [Dr. DeSoto] was going to come over on May 6… we were waiting for her."* |
| **On Monday, May 6** SAS Director Tiffany Dodd contacted Adam Butler; the Associate Provost was involved regarding how to proceed | 15.35 "I subsequently emailed and spoke to Adam Butler. John Vallentine was involved "I talked to John Vallentine and Adam Butler and my boss…" |
| **Wednesday, May 8**: Administrative coordination escalated, including UNI's legal counsel. | (Dodd): *"The attorney was involved… there was an email exchange between the attorney and Vallentine, I think Allyson and me, maybe Butler, probably Brenda Bass too."* |
| **May 8, 2024**: Dodd admits she had already formed a plan for what she would tell the student in spite of Dr. DeSoto's offer to hand-deliver the exam to SAS. | (17:03). Dodd: ***"My plan was to tell the student, 'hey, we don't have the exam.'"*** |
| **May 8–9, 2024**: Zoom meeting held among Vallentine, Bilder, and Dodd to discuss the student complaint and next steps. | ~1:12:10 "more email exchanges than verbal. Although there were a couple of Zoom verbal conversations with various members of that group" |
| Dodd confirmed this was handled at the highest levels, with Title IX coordinator and Legal Counsel. Confirmation of coordinated discussions beyond routine SAS work | ~1:12:10).Dodd confirmed this was handled at the highest levels: *"there was conversation with the attorney, and John Vallentine, Adam Butler, Brenda Bass… Leah was also in on some of the email exchanges."* |

112.     Transcripts show that Dodd and others explicitly described a *plan to tell the student that Prof. DeSoto had refused to provide the exam*. When the student did not show up as expected, Dodd amended the plan to falsely claim that DeSoto had deliberately misinformed the student, confusing her, all with the goal to elicit a formal complaint—*now telling the student they had the exam all along and that DeSoto falsely told her there was a problem* because she doesn't like students to receive accommodations. Dodd's own words document this preplanned strategy, including an acknowledgment that Dodd's words caused confusion in the student and made her

rethink her understanding. Per Dodd's description of the student's reaction to being told this false information by Dodd, the student expressed confusion: "wait hold up, I'm confused."

113. The student's email to OCEM on May 17, 2024, reflects this manipulation, falsely asserting that she had been "been informed" that "Prof. DeSoto knew" that she (the student) had complained to SAS when grading her final exam and attributing "Prof. DeSoto's own personal views about persons with disabilities." These facts, together with the Zoom meetings, transcripts, and communications, demonstrate a deliberate and malicious violation of UNI Policies 13.02 and 12.01, including prejudgment, provision of false information, and intentional circumvention of required informal resolution with the intent of generating a complaint. The allegation was always wholly without merit, directly contradicts DeSoto's long-standing record of accurate and fair evaluation, and exemplifies a broader pattern of administrative misconduct and pretextual allegations designed to harass DeSoto and undermine her professional integrity.

## F. The Biased Investigation

Gutknecht chose the investigator to investigate the student disability discrimination complaint. Brenda White from the OCRC conducted the investigation into the Student's disability discrimination complaint. The investigation was wrought with bias. The investigation ignored fundamentally relevant documents, misinterpreted clear communications between the Student and DeSoto, did not include interviews of DeSoto's witnesses, did not reference her evidence and unfairly questioned DeSoto's credibility and professionalism while accepting as gospel every allegation against DeSoto and crediting witnesses with clear bias against DeSoto including Dodd and Butler. The initial findings from Brenda White were provided to DeSoto on July 12, 2024.

114. On July 29, 2024, DeSoto officially complained of the bias in a letter to Uni President Mark Nook. DeSoto indicated to UNI President Mark Nook that she believed the investigation and process was biased against her. She formally requested an unbiased investigator re-investigate the allegations of the Student's complaint. Nook responded by slightly modifying procedures, and allowed that he and Counsel Bilder would select the Decision Maker.

115. On August 2, 2024, DeSoto provided a response to the draft investigator report. The Student did not respond. From the moment the gross deficiencies of the investigative report were revealed—such as the systematic ignoring of context, evidence, and witness testimony— 100% of DeSoto's protests and attempts to insert factual corrections were limited to written responses. Every good-faith effort by DeSoto to meet in person, to respond, to question witnesses, or to appear before a committee has been blocked. DeSoto has never—at any point— been permitted to question any of the following individuals regarding their false statements: the Student, Dodd, Butler, or White. Such obstruction directly undermines basic principles of procedural due process, including the right to respond to evidence and adverse witness statements before findings are imposed—rights protected by the Fourteenth Amendment and expressly incorporated into UNI Policy 13.02

116. DeSoto wrote an eleven-page, point-by-point dispute of the investigative report, identifying numerous biases and clear inaccuracies. White essentially ignored most of these objections and did not revise the investigative report in any meaningful way. Some of these materials used by the Decision Maker have still not been provided leaving DeSoto without any opportunity to confront or clarify the record—a procedural deprivation.

117. On August 23, 2024, as part of a purported move to remove potential bias, Nook appointed Kara Hughes of Grand River Solutions as the Decision Maker for the Student complaint.

118. Unknown to DeSoto, On September 16 and 17, Hughes conducted her own secret investigation and interviewed Dodd and Butler and "gathered additional materials." Some of these materials and interviews remain secreted from DeSoto to this day.

When Butler refused to honor DeSoto's *Weingarten* request he also falsely claimed in the undisclosed interview with UNI's chosen "Decision Maker," Kara Hughes[6] -- that DeSoto "hung up on him" and refused to cooperate. Notably, this undisclosed investigatory interview with Butler, where he sharply mischaracterized events for the record, formed a significant part of an appeal that was ultimately granted. Butler called twice in quick succession and would not allow DeSoto time to consult with Martin. This, and other false statements about Prof. DeSoto, were then incorporated into the decision. From Hughes' Decision: "(Butler) said that he placed the call as requested…. (Butler) said, 'I called and said that I'd sent her an email the previous day, and she stopped me, interrupted me, and said that she would only speak to me with a United Faculty Representative and she hung up.' Witness D stated that he immediately called Respondent back and told her, 'We need a copy of the test.' He said that in response, Respondent said, 'I made myself clear,' and then hung up. He said that this was the end of his interactions with Respondent regarding the matter." Tiffany Dodd said in an interview "And Kathy, when was not responsive. And then, ultimately, Adam shared that he had called her and said, you need to do this, you need to provide this test. And she hung up on him."

---

[6] As shown below, the Student was prodded and goaded into filing a bogus complaint alleging disability discrimination against DeSoto.

119.     Using DeSoto's assertion of her *Weingarten* rights against her was both illegal and retaliatory. Employees are legally entitled to representation during investigatory interviews, and any adverse use of such a request—whether by mischaracterizing it, using it to allege non-cooperation, or basing disciplinary or other negative findings on it—is expressly prohibited under federal labor law and fundamental due process protections. Here, Defendants did not merely deny representation but affirmatively weaponized DeSoto's invocation of that right as evidence against her, demonstrating retaliatory intent and bad faith.

120.     On November 11, 2024, UNI issued a decision finding discrimination on Allegations one through three and five; and determining DeSoto committed discriminatory harassment on Allegations one through three and five and six.[7]

121.     Immediately after the decision was issued, the Student demanded her requested grade change (Student wrote in an email to Butler "now that there is a guilty verdict…". Without regard to appeals or UNI policy, UNI administration including Bass with the support and direction of Bulter, Neilson, and Bilder unilaterally changed the Student's grade without any notice whatsoever to the instructor of record, Professor DeSoto.

122.      The UNI grade change policy formally states:

"Recognizing that grade determinations are an integral part of a faculty member's academic freedom, administrative officers cannot substitute their judgment for that of the faculty concerning the assignment of a grade except as a result of the grievance process outlined in this policy or as defined by circumstances requiring an administrative grade change as documented in University policy regarding administrative grade changes."

---

[7] The report from Hughes indicated that "…the evidence gathered does not substantiate that she (DeSoto) engaged in discriminatory behavior toward Complainant when she refused to provide SAS, and later Witness D (Butler), with a copy of the final exam. Despite this finding the November 13, 2024, letter from Nook to DeSoto states that DeSoto violated UNI policy by engaging in Discriminatory Harassment with respect to Allegation 6.

123.     All faculty know that only faculty of record assign grades and all faculty know the appeal process.  On February 25, 2025, letter to Nook, United Faculty alerted UNI that the grade change was in clear violation of UNI policy. Nook and UNI ignored the letter and still have not addressed the issue. The National AAUP has also written both an advisory and a warning letter. Yet UNI has refused to engage, and has refused to allow hearings and appeals to move forward, as detailed below. Taken together, these facts demonstrate defendants knowingly and maliciously disregarded mandatory, clearly established university policies governing grade changes, hearings, and appeals after explicit notice, demonstrating bad faith and deliberate indifference and foreclosing any claim that Defendants were exercising lawful discretionary judgment.

### G.     DeSoto Appeals the Discrimination Finding

124.     On November 20, 2024, DeSoto appealed the original discrimination decision against her.

125.     On appeal, DeSoto asserted that she was denied Due Process because the Decision Maker conducted interviews and obtained evidence which was never disclosed to DeSoto. The Appeal did not contest the Decision Maker's ability to speak with witnesses, it stated that information provided by these additional witnesses was "patently false" and "speculative," and that Respondent had "no chance to rebut despite her right to do so."

126.     The appeal asserted, "Because these [new] witnesses were unchallenged by [Respondent DeSoto] and there was no opportunity to respond or rebut the withheld witness allegations, [DeSoto] was unable to even try to show the bias of the stealth witnesses" The additional evidence included undisclosed interviews of Butler.

127. On January 9, 2025, Dan Schorr, the University's hired appeal officer, *vacated the decision and remanded the matter to the Decision Maker*. Specifically, Schorr stated that using a preponderance of the evidence standard, the Appeal does establish that Respondent did not have an opportunity to "fully review and respond to all evidence on the record" and that this did constitute a procedural irregularity that may have "affected the outcome of the matter."

128. Further Schorr found, "[A] sufficient basis for concluding that there has been a procedural irregularity that may have affected the outcome of the matter because [DeSoto] *was not provided an opportunity to "fully review and respond to all of the evidence on the record.*"

### H. Failure to Provide Due Process on Remand After Initial Appeal and Remand

129. On remand DeSoto sought the transcripts of the interview of Butler and Dodd. In response she was provided with "redacted" transcripts of the interviews. When DeSoto inquired as to the "redacted" information, DeSoto was advised that Hughes withheld portions of the interview of Butler based on UNI's assertion of "attorney -client privilege" as advised by Bilder as UNI counsel.

130. The redacted information appears to be important as the transcript shows that immediately after the redacted statements, Hughes conveys agreement to whatever it was that had been redacted.

131. DeSoto questioned the application of attorney-client privilege regarding information a witness provides to a decision maker and asserted that if information provided by Butler to Hughes was going to continue to be withheld, a new Decision Maker needed to be appointed who did not have access to the secret information.

UNI ignored this request. Instead, despite the remand specifically indicating that DeSoto was entitled to review *all* the evidence used by the Decision Maker, information was still purposely withheld.

132. Based on information and belief, DeSoto asserts that the withheld information would reveal damaging evidence of coordinated and conspiratorial conduct aspects of the conspiratorial actions taken by the Defendants, **knowingly and in bad faith** and each them, in furtherance of the attempt to disgrace, defame her for the purpose of forcing her removal from UNI.

133. On March 27, 2025, United Faculty legal counsel Emily Schott Hood wrote to Nook and asserted that DeSoto had a Due Process right to the redacted information. United Faculty counsel, independent of DeSoto or her private counsel cited controlling case law and explained why Attorney Client could not apply. UNI and Nook ignored this letter. The letter is incorporated herein as Exhibit "A."

134. Ignoring all requests for the redacted information by two independent counsels, by AAUP and United faculty then resubmitted the matter after remand without ever providing the redacted information tacitly admitting that DeSoto was not provided with all of the information used by the Decision Maker. On May21, 2025, after additional investigation (that never included speaking to DeSoto which DeSoto requested, or the students or witnesses DeSoto felt most crucial – but reinterviewing witnesses against DeSoto, Hughes as Decision Maker made essentially the same decision that she made in her November 2024 decision. Hughes May 21, 2025, Incredibly, the decision made no reference to the fact that information continued to be withheld from DeSoto but the attachments to the decision as support contained the still redacted interview of Butler. The redacted portions include not just statements by Butler but questions

from the Decision Maker. Proceeding to reaffirm the same adverse decision while knowingly withholding material evidence from DeSoto, despite repeated notice and appeal, constituted a deliberate and bad-faith violation of clearly established due-process rights, not a discretionary judgment.

135. The attachment to Hughes' decision on remand included the following redacted information:



Witness D (10:16):
Or whenever the class was. That's what it sticks in my head. Was it eight? I can't remember exactly.

Hughes (10:22):
I think the class started at eight and the students took it at eight 30 from what I recall. So yes, You're in the ballpark.

Witness D (10:26):
So in any event, yeah, so then I think the associate Provost for faculty canceled that meeting once he learned that the student had already taken the test, and then I don't really know what happened.

Hughes (11:21):
Gotcha.

Witness D (11:23):
That's my, yeah.

Hughes (11:25):

Witness D (11:30):

Hughes (11:32):

Witness D (11:35):

Hughes (12:07):
Was there any resolution to the student with this specific final for [Respondent]'s class reached?

CONFIDENTIAL

**RE: In advance of our Feb 26 meeting**

**From** Kara Hughes <khughes@grandriversolutions.com>

**Date** Thu 3/6/2025 2:59 PM

**To** ▮Witness A▮

H▮Witness A▮

I hope that this finds you doing well. I am writing to review what we discussed on March 3, and to propose a path forward.

To review: On March 3 we met for a hopeful 60-minute interview. After I shared with you an overview of the purpose of our meeting (recap below) and you shared with me your concerns (recap below), we decided not to move forward with an interview until I could obtain answers to your concerns/questions.

- Kara's purpose in wanting to interview ▮Witness A▮
  - Give ▮JV▮ s retirement, to gain from ▮Witness▮ a better understanding of the events following a stude ▮Complainant▮taki ▮Respondent▮ 2024 PSYCH 3101 Biological Psychology final exam
  - To obtain any correspondence/communications ▮Witness A▮ may have been a part of that were not previously collected by the UNI Investigator. Specifically:
    - Any fall 2023 or spring 2024 communications ▮Witness A▮ had with then-Associate Provost ▮JV▮ and/or other colleagues that contain reference t ▮Respondent▮ concerns/complaints about SAS practices and protocols
    - Any and all emails between ▮Witness A▮ and colleagues on or around May 8, 2024, that concer ▮Complainant▮ ▮taki▮ ▮Respondent▮ s spring 2024 PSYCH 3101 Biological Psychology final exam

- ▮Witness A▮ expressed:
  -
  - Some of the materials Kara requested were materials that the Investigator had previously requested o ▮Witness A▮and she did not provide to the Investigator, feeling that the request "went beyond the scope of the investigation" as best she understood it.

A proposed path forward: In lieu of my conducting an interview, I am hopeful that you can answer a few questions via email (see questions below). I also remain interested in obtaining the communications that fall into the named categories above (i.e., emails between you and ▮JV▮ that contain reference to ▮Respondent▮ concerns about SAS practices and protocols, and emails between you and colleagues abo ▮Complainant▮ taking 2024 PSYCH 3101 Biological Psychology final exam). While I understand that it is your position that the requested documentation falls outside the scope of the investigation, during the course of the investigation it was the Investigator's responsibility to determine relevance. And, following, as the case is now in its post-appeal phase, as the assigned Decision Maker, it is my responsibility to determine relevance, and I do believe that the information being requested is relevant to the allegations made in this case.

## I. DeSoto's Second Appeal

136. DeSoto timely appealed the remanded decision from Hughes on May 28, 2025. In the second appeal, DeSoto again asserted that the redacted interviews were clandestine and

denied her Due Process. DeSoto also asserted that the Decision Maker again refused to consider relevant information and witnesses. Further DeSoto asserted that new information about the wholly improper grade change showed bias and unacceptable secrecy and conflicts of interests by UNI and the Defendants.

137. Chapter 11.2(a) of the UNI Faculty Handbook states that the University's procedures for handling misconduct and dismissal cases are intended to provide "a reasonable guarantee of compliance with standards of academic due process, especially as these are enunciated in the *1940 Statement of Principles of Academic Freedom and Tenure* (of the American Association of University Professors)." Despite this express incorporation of AAUP standards, the Faculty Petition Committee has continued to operate for more than a year in a structure that the AAUP has formally and explicitly identified as noncompliant. This safeguard has been denied Professor DeSoto under the direct oversight of the associate provost for two years and remains functionally closed to Professor DeSoto. By expressly adopting AAUP standards as governing due-process protections in the Faculty Handbook, UNI rendered those standards mandatory and clearly established; Defendants' knowing refusal to follow them constitutes bad faith conduct rather than any permissible exercise of discretion.

138. On June 11, 2025, fourteen days after DeSoto appealed the second decision, UNI Provost, Jose Herrera wrote DeSoto and invited her to write an impact statement pending imminent disciplinary action for disability discrimination that were going to be imposed by Herrera and Bass.

139. On June 12, 2025, DeSoto, through counsel, wrote to Nook and asked in good faith for clarification, specifically asking if DeSoto's second appeal was being processed.

DeSoto, through counsel, was seeking information about the status of her appeal in good faith and noted that imminent travel made timely clarification important.

140. On June 16, 2025, Nook responded by stating that he was in receipt of the appeal and the letter concerning the appeal and he would, "take these matters under advisement and respond following that consideration." Nook further stated, "*With regard to your question about an opportunity to appeal, such an opportunity will be available*."

141. On June 17, 2025, DeSoto, through counsel, inquired if, given Nook's June 16, 2025, correspondence permitting the appeal, whether the June 11, 2025, letter from Herrera was void pending the appeal. Nook, Bilder, and Bass were providing clearly mixed messages about DeSoto's status. Nook was again questioned about DeSoto's second appeal. The email was sent to Nook and Bilder; *neither responded.*

142. With no regard to appeal DeSoto filed in May of 2025, on August 14, 2025, UNI issued two distinct communications. Because we anticipate this point will be attempted to be confused, we clarify that two procedural steps were taken on the same day but issued as two separate and distinct letters. First, a communication of disciplinary action was sent, and then as a separate communication, a formal "Letter of Reprimand" was issued. A Letter of Reprimand *is* a sanction according to the Faculty Handbook. This letter defined itself as an official Letter of Reprimand and was, in plain fact, sent separately from the 'communication of disciplinary action' letter. The Reprimand Letter stated a bar on committee work was in effect, gave dated timelines that the mandatory training was to be completed by, and stated a fine whose amount qualified it as a major sanction, though no appeal was or has been allowed. The "letter of reprimand" included a fine of $6,230.00 and even required DeSoto to have all communications with the SAS office mediated by Butler.

143. UNI is required under its stated policy to consult with two faculty leaders when imposing sanctions on faculty. This consultation occurred on or about July 15, while DeSoto (as well as Counsel) was out of the country. The two faculty leaders—the Faculty Chair and the Chair of the Senate—were not informed that an appeal had already been submitted and/or that DeSoto (at least believed) it remained pending. By withholding these material facts, UNI effectively conspired to deprive DeSoto of due process. Email records further demonstrate that DeSoto had not filed an impact statement because she reasonably believed her appeal would first be processed, and she was not clearly notified that sanctioning proceedings were occurring. UNI administration knew all of this and still **scheduled** the meeting. This is part **of** the pattern of not acting in good faith. It violated her right to timely and accurate notice of proceedings, her right to a fair opportunity to be heard, and the fundamental guarantees of due process.

144. On August 22, 2025, Nielsen sent a letter to DeSoto. The letter indicated that UNI had not yet received an appeal of the sanctions entered on August 14, 2025. Without acknowledging that DeSoto had filed an appeal on May 28, 2025, Nielsen stated that if DeSoto appealed, the appeal would be forwarded to the Appeal Officer for review. DeSoto had already appealed the second decision months prior. The email records show that multiple parties (counsel, DeSoto herself, and United Faculty) quoted the exact wording for UNI's policy 13.02 which plainly permits a second appeal when there is *either* a remand or a new decision (*both* of which occurred). Exact wording of the full paragraph of UNI's policy 13.02 reads "Once an appeal is decided, the outcome is final: further appeals to the University are not permitted *except in the case of a remand for a new investigation and/or new determination by a Decision Maker*."

145. To be clear: DeSoto, through counsel, submitted a good-faith request for clarification regarding the status of her second appeal submitted to the university three times without response. The university's failure to respond to this request, followed by the apparent denial of the appeal without ever processing it, constitutes a denial of procedural due process specifically provided for in policy 13.02 **and protected by the Fourteenth Amendment**. This sequence not only deprived DeSoto of the opportunity to be heard or to address the allegations against her but also exemplifies a broader pattern of bias and obstruction documented throughout this case. Collectively, these actions demonstrate a systematic disregard for fundamental procedural fairness and for DeSoto's rights.

**J.**      **Interference and Non-Compliance: Faculty Petition Committee**

146. Associate Provost Nielsen, with the support of Herrera, Nook, and Butler, and at the direction of Ann Bilder, intentionally and repeatedly blocked DeSoto's access to the Faculty Petition Committee—access expressly guaranteed under UNI's dispute-resolution process. Nielsen imposed arbitrary and extra-procedural requirements not contemplated by policy, including unnecessary meetings with administrators, and then denied access at the last minute even after DeSoto satisfied each imposed condition.

147. DeSoto attempted to invoke the Faculty Petition process on at least six occasions and was prevented every time. In one instance, Nielsen approved a process allowing DeSoto only twenty minutes to speak, followed by thirty minutes of presentation by UNI legal counsel Ann Bilder outside DeSoto's presence, with no opportunity for DeSoto to hear or respond. Even that meeting was canceled on the eve of the scheduled November 14 hearing—after DeSoto had not only met the extra steps but had also prepared her remarks and assembled evidence.

148. Although Chapter 12 of the Faculty Handbook provides that, upon presentation of a Faculty Petition, the Faculty Petition Committee *shall convene* within fifteen days, UNI—acting through senior administrators—has interpreted "convene" to permit the Committee to meet and summarily decline to hear the petition without providing the faculty member any opportunity to appear, present argument, or respond beyond the initial form submission. In practice, the Committee is chaired and gatekept by administrators, and faculty petitioners are afforded no meaningful access to the body purportedly established to resolve such disputes. As the American Association of University Professors has formally warned UNI, this structure deprives faculty of an independent grievance process and is inconsistent with fundamental principles of shared governance and due process

149. These actions were contrary to the mandatory requirements of Faculty Handbook §§ 12.0, 12.3(d), 12.3(e), 12.3(f), and 12.6(b)–(c), which guarantee faculty access to an internal petition process. Nielsen was repeatedly advised by United Faculty and by the national AAUP that UNI's administration of the Faculty Petition Committee was inconsistent with those requirements and with fundamental principles of shared governance, yet declined to alter the process. Plaintiff alleges that Defendants' continued obstruction, despite clear notice and the absence of any discretionary authority, was undertaken knowingly, intentionally, and with malice.

150. On December 12, 2025, the Faculty Petition Committee issued yet another negative decision declining to hear DeSoto that was signed by Nielsen, Associate Provost, an administrator who holds supervisory authority over faculty members serving on the committee (and who is directly or indirectly implicated in the underlying procedural failures at issue). No appeal was heard.

151. This action occurred as part of a constant denial of appeal and petition rights that chill free speech and foster harassment. This is despite explicit warnings from the AAUP and without any revision to the committee's composition or procedures, the procedure's manifestly operating outside AAUP guidelines. As the national AAUP writes to UN, "Regulation 16 states that the committee that receives such grievances should comprise only faculty representatives… 'No officer of the administration will serve on the committee.'" The AAUP further observed that at UNI: "Half the committee, therefore, are either administrative officers or administrative appointees," and urged corrective action: "We would accordingly urge that the faculty handbook be amended so that the faculty petition committee consists solely of faculty members chosen by the faculty or its elected representatives."

152. The decision to not hear the petition under the direction and pressure of UNI administrators relied on demonstrably false assertions that materially affected the outcome. First, the Committee asserted that the petition was untimely under Subdivision 12.3b, which requires filing within sixty days. This conclusion is incorrect. Counting instructional days beginning with the start of the fall semester, excluding weekends and the Labor Day holiday, the petition was filed within sixty class days, as required by the Handbook. The decision did not explain how the sixty-day period was calculated, did not account for the academic calendar, and did not address the dates stated on the petition form. Second, the decision asserted that the petition failed to state a desired outcome under Subdivision 12.3c. This assertion is also patently incorrect. The petition explicitly stated the desired outcome as "grade returned to what was earned based on performance and the syllabus," language that appears directly on the petition form and satisfies the stated requirement.

**K.** **Interference and Non-Compliance: Mandatory Faculty Hearing and Internal Appeal Rights.**

153. After UNI imposed a major sanction on DeSoto without a prior faculty hearing, DeSoto timely invoked her right to Faculty Hearing Board review pursuant to Faculty Handbook § 11.4b.8. That provision is mandatory: Once a faculty member timely requests review of a major sanction, the Chair of the Faculty *will empanel* a Faculty Hearing Board (§ 11.4b.8), and Chapter 13 expressly routes such appeals into that Chapter 11 faculty-controlled process (§ 13.3b), leaving no discretion for administrators to delay, influence, or obstruct formation of the Board. Chapter 13, § 13.3b further provides that where a major sanction is imposed without prior faculty review, the appeal *must* proceed through the Chapter 11 Faculty Hearing Board process. Notwithstanding these non-discretionary requirements, Associate Provost Amy Nielsen privately met with and pressured the Chair of the Faculty, Kenneth Elgersma, urging him to delay or halt formation of the Faculty Hearing Board, telling him to "go home and sleep on it" and to "consider the institution." This conduct—documented contemporaneously in a signed account by United Faculty leadership—constituted intentional, *ex parte* administrative interference with a mandatory faculty review and appeal process, in violation of §§ 11.4b.8 and 13.3b, shared-governance protections, and fundamental due-process guarantees. Nielsen's actions were undertaken in bad faith and for the purpose of obstructing faculty review of imposed major sanctions.

154. By privately pressuring the Chair of the Faculty to delay or halt formation of a mandatory Faculty Hearing Board after a timely appeal, Nielsen knowingly interfered with a non-discretionary adjudicative process, violating clearly established procedural due-process rights and foreclosing any claim to qualified immunity.

155.    Below is the key excerpt from the contemporaneously written account signed by Chris Martin, UF president, and by Fernando Calderon, UF vice president of their Sept 22, 2024 meeting with Neilson.

> *...she met with and spoke to Kenneth (Elgersma, the Chair of the Faculty at UNI and professor of Biology) late last week. She said she asked him to delay or stop the formation of the Faculty Hearing Board (the board that the Chair of the Faculty forms in response to Cathy's appeal to the major sanctions by the university; the Faculty Hearing Board formation process is documented in Paragraph 11.4b.8 of the Faculty Handbook). She said she suggested Kenneth "go home and sleep on" her recommendations for delay or stoppage. She added that she asked Kenneth "to consider the institution as well as the student" in doing so. Amy said she wanted to tell us that she met with and spoke to Kenneth (Elgersma, the Chair of the Faculty at UNI and professor of Biology) late last week. She said she asked him to delay or stop the formation of the Faculty Hearing Board (the board that the Chair of the Faculty forms in response to Cathy's appeal to the major sanctions by the university; the Faculty Hearing Board formation process is documented in Paragraph 11.4b.8 of the Faculty Handbook). She said she suggested Kenneth "go home and sleep on" her recommendations for delay or stoppage. She added that she asked Kenneth "to consider the institution as well as the student" in doing so....*

156.    The faculty chair that the associate provost pressured not to convene has in fact did not convene the committee even though the appeal request was filed at the beginning of the fall 2025 semester.  The most recent communication stated it was effectively tabled for the whole semester, until after the new year.

### K.    DeSoto's Title IX Complaint

157.    On November 4, 2025, after years of continuously blocking DeSoto from filing a formal Title IX complaint against Butler for sex-based discrimination and retaliation (chronicled in long table in section above), Gutknecht formally allowed DeSoto's formal complaint to go forward but only after DeSoto involved her own counsel.

158.    On September 17, 2024, Butler wrote a formal letter of reprimand against DeSoto that was factually baseless, harassing, and served no purpose other than to falsely portray

Plaintiff as unprofessional. Even so and even with counsel advising, DeSoto needed to press the issue with Gutknecht for weeks before the complaint was formally "accepted" and filed.

159. The September 17, 2024, reprimand by Butler falsely asserted that normal office behavior was unacceptable to university staff. In this email, Butler asserted that DeSoto had been rude and had offended office staff with unprofessional and impolite communication. Butler sent the reprimand to Dean Brenda Bass, and the Associate Provost Amy Nielson. These are the same individuals who were included in communications (calls, zoom meetings) during the Final Exam actions with SAS (see short Table in Section above). The email even suggested that DeSoto seek counseling for her supposed "difficulties with professional relationships," which was both insulting and demeaning. This constituted harassment toward DeSoto and caused significant emotional and professional stress. The email contained these words:

"The tone of your email, which I think is fair to characterize as pointed and impatient, is not acceptable to either me or the office staff, who found it stressful. Dorothy responded promptly and correctly to your previous request about where to find your annual letters. You have previously been warned, several times, about a pattern of unprofessional communication, and this current episode suggests that this remains a problem which you are unwilling to address. I am informing you again: You need to communicate with your colleagues in a manner that is polite and respectful of the work that they are doing. You may find it helpful to speak with a counselor through EAP about your ongoing difficulties with professional relationships."

160. "Dorothy" mentioned in the reprimand, is Dorothy Burt. Burt categorically denies ever being offended in any way by the requests made in DeSoto's email. Butler made up the allegations out of whole cloth.

161. September 17 is an important date. Of note, this fictitious reprimand by Butler was sent *on the very same day he gave secretive information to Hughes in the disability discrimination matter*. The timing suggests this falsified reprimand was part of a continuing pattern and course of embarrass and defaming conduct by Butler to harass DeSoto on the basis of her sex that has continued since 2017 The Appeal Officer ordered that all witness interview

materials be provided to DeSoto so that she could respond, yet Defendants knowingly produced the September 17, 2024 interview in redacted form, despite the absence of any valid privilege. That decision to conceal material evidence—on the same day Butler issued a false reprimand and participated in an undisclosed *ex parte* interview with the Decision Maker—supports the inference of knowing, coordinated misconduct undertaken in conscious disregard of clearly established due-process requirements.

162. This reprimand was circulated to other university administrators as part of a coordinated effort to manufacture a disciplinary record against Plaintiff and to lay a false foundation for subsequent adverse actions and dismissal. Its co-occurrence—on the same day— with other false statements, documented in the written record, made to the Decision Maker in the student case during an undisclosed interview, further demonstrates the pretextual nature of this effort in tandem with the student complaint process. Plaintiff expects that discovery will disclose the substance of the September 17, 2024 redactions—material that Defendants have withheld despite an order to produce—and that this evidence will illuminate the coordinated nature of the conduct at issue.

163. Butler confiscated physical evidence favorable to DeSoto and attempted to influence staff to provide false statements about office routines that would be exculpatory to DeSoto. Butler intimidated at least one witness, Dorothy Burt, warning that cooperating with OCRC could disrupt the department and make personal emails public. Butler also forcibly demanded that Burt turn over her cell phone so that Butler could view any messages or communications between Burt and DeSoto. Butler's actions caused her genuine fear and led Burt to avoid communicating with DeSoto.

164. Butler issued unreasonable criticisms several times over the years her attempts to get assistance from OCRC were denied, including admonishing DeSoto for missing a student email while she was under general anesthesia and on medical leave, he himself had signed off on. On a regular basis Butler would comment to members of the Psychology Department and staff falsely claiming that DeSoto was suffering from mental illness that affected her professional ability.

165. Butler's performance evaluations of DeSoto were maligned with misinformation and contained unfair assessments of her teaching and publishing achievements. For example, her 2023–2024 performance evaluation rated her as "meets expectations" rather than "exceeds expectations," despite her receipt of the UNI Distinguished Scholar Award—an honor given annually to a senior scholar with a long and distinguished record of publications and a professional reputation of national or international significance. Additionally, the publications she submitted for evaluation included *Lies of Omission: Algorithms Versus Democracy*, a 210-page book with hundreds of references connected to several of her other works. The book was published nationally by Skyhorse Publishing, a publisher with 112 New York Times bestsellers and recognized by *Publishers Weekly* as the fastest-growing small publisher in the United States. DeSoto also had a first author publication in a top tier journal of the topic of poor nutrition as a cause of neural effects leading to anxiety and depression. Despite these accomplishments, Butler continually ranks her as merely meets expectations with respect to her publishing requirements at the University. Butler's discriminatory evaluations led him to disregard DeSoto's book entirely as "scholarship." Butler repeatedly and falsely characterized her class as having "no assignments and only two exams," despite DeSoto's submission of ample examples of carefully graded written assignments beyond exams. He selectively highlighted rare negative comments while

ignoring positive feedback and strong objective indicators of teaching quality. The documentation on this point is clear and unequivocal. The discrimination, now ongoing for years was and is palpable.

166. Butler saved his yelling rants for female subordinates (three we know of, a fourth is suspected). On the rare occasion that he raised his voice at a male employee, he would quickly apologize. Butler's demeaning behavior toward women is not limited to DeSoto. As referred to in prior section, when temporary Department Head of the Department of Social Work, Butler baselessly yelled and screamed unprofessionally at a female faculty, he has sought to "weaponize" UNI's discrimination and complaint policy as a means of advancing his discrimination against women. He has yelled and cursed at his secretarial staff member Dorothy Burt and brought her to tears on one or more occasions. UNI and Leah Guthnecht and Kaylee Michelson in particular have protected and abetted this behavior. This sex-differentiated pattern of intimidation was known to, reported to, and consciously disregarded by UNI administrators and Title IX officials, demonstrating deliberate indifference to gender-based harassment rather than isolated misconduct.

167. UNI, Gutknecht, and Michelsen have purposely slowed and delayed a formal Title IX investigation into Butler, reported and requested, hat same day, **May 8, 2024**, Butler was actively participating in administrative coordination to initiate a false disability discrimination complaint against DeSoto, demonstrating that his inquiries were not benign but part of a **contemporaneous retaliatory effort directly connected to her protected speech** via the online system, in September of 2024. Incredibly, as of August 2025—nearly a year later—Butler had been interviewed only once and no information regarding his responses had been provided, while

witness interference and intimidation on his part were permitted and tacitly abetted. .In this light, DeSoto raised procedural concerns about the Title IX process.

## V.     SUMMARIES

### A.  <u>Role of Ann Bilder</u>

168.     In addition to Bilder's specific acts and omissions stated above, the following paragraphs set forth specific instances of illegal and actionable conduct.

169.     Rather than correcting these failures, university counsel Ann Bilder intervened to terminate the investigation entirely, compounding the due-process violations described above. University Counsel Ann Bilder has been central in the conduct at issue. She personally participated in, directed, and ratified actions that obstructed mandatory investigative processes and violated clearly established procedural rights. Bilder played a central role in pausing—and effectively halting—the investigation of Adam Butler after it had been formally initiated, despite corroborating evidence and witness cooperation, and notwithstanding UNI's non-discretionary obligations under Title IX and UNI Policy 13.02 (Process B).

170.     After Dr. DeSoto raised a formal bias concern pursuant to policy 12.01 (Process B) §7, which guarantees complainants "the right to have reports of alleged policy violations addressed by Investigators, Title IX Coordinators, and Decision Makers who have received relevant annual training," Bilder intervened directly. DeSoto raised the concern in full compliance with policy and with counsel present. Policy 12.01 further provides that when bias concerns involve the Title IX Coordinator, they should be raised with the University President; DeSoto had already attempted that route months earlier, without response.  She therefore properly raised the concern before a trained official on August 25, reading from a letter with Counsel present.

171. During this recorded meeting on August 25, 2025, Bilder demanded that Dr. DeSoto "recant" her properly raised, protected bias concern and stated that the investigation would end if she did not. When DeSoto properly refused, Bilder abruptly terminated the meeting. The investigation was immediately paused and has remained stalled indefinitely, under Bilder's direction. This conduct exceeded any legitimate advisory role and directly interfered with DeSoto's express Policy 12.01 right to have her complaint addressed by a Title IX trained, unbiased investigators and decision-makers.

172. Bilder further played a central in abetting ongoing procedural violations by directing the continued withholding and redaction of evidence from Dr. DeSoto, including evidence relied upon by decision-makers, while permitting undisclosed interviews and off-record communications that disadvantaged her. After an external Appeal Officer granted DeSoto's appeal and ordered that all witness statements be provided so she could respond, the University nonetheless produced only redacted transcripts at Bilder's specific direction.

173. United Faculty's counsel formally warned Bilder in writing that failure to provide unredacted witness statements violated 12.01 Process B §§8 and 17 and controlling Iowa and federal law, expressly explaining that attorney–client privilege does not apply to witness statements given to a Decision Maker, particularly where no attorney was present. Bilder received this warning, provided no substantive response, and continued to direct formal non-compliance. These actions were not discretionary legal advice but intentional interference with mandatory procedures, undertaken with knowledge of governing policy and in bad faith.

174. The actions in this subsection are in no way to be considered all-inclusive and are simply meant as a summary of the allegations against Bilder for the benefit for the reader.

## B. Role of Kara Hughes - Decision Maker

175. In addition to Hughes' specific acts and omissions stated above, the following paragraphs set forth specific instances of illegal and actionable conduct.

176. Decision Maker Kara Hughes personally violated mandatory Process B requirements and deprived Dr. DeSoto of clearly established procedural rights. Acting as the designated Decision Maker, Hughes received and relied upon witness statements and other evidence while refusing to provide that same evidence to DeSoto, conducted undisclosed interviews, and repeatedly consulted with UNI administration—including Tiffany Dodd and Adam Butler—while refusing to speak with DeSoto. This occurred despite Hughes's training that such conduct was improper and while she disregarded evidence DeSoto submitted in writing.

177. Hughes also failed to comply with an express remand directive from the external Appeal Officer requiring disclosure of all evidence. She acknowledged receiving witness information that was not shared with DeSoto, yet continued to adjudicate the matter while withholding that evidence, in direct violation of Process B §§ 8 and 17, which require that both parties receive the evidence relied upon and have an opportunity to respond.

178. Hughes persisted in withholding unredacted witness statements even after United Faculty counsel Emily S. Schott Hood advised in writing that attorney–client privilege does not apply to witness statements given to a Decision Maker and that continued redaction violated Process B and controlling Iowa law. Hughes nevertheless deferred to instructions from University Counsel Ann Bilder, despite Bilder's direct involvement in events preceding the complaint and despite the Appeal Officer's clear directive. Hughes's refusal to disclose evidence and continued adjudication while denying DeSoto access to the evidentiary record were not discretionary judgment calls but intentional departures from mandatory procedure.

179. The actions in this subsection are in no way to be considered all-inclusive and are simply meant as a summary of the allegations against Bilder for the benefit for the reader.

## C. Role of Leah Gutknecht – (OCEM / Title IX Coordinator)

180. In addition to Gutknecht's specific acts and omissions stated above, the following paragraphs set forth specific instances of illegal and actionable conduct.

181. Leah Gutknecht personally and repeatedly failed to initiate, conduct, or permit a neutral Title IX investigation into Dr. DeSoto's reports of sex-based harassment and retaliation by Department Head Adam Butler, despite years of actual notice and mandatory duties under UNI Policy 13.02 (Process B) and federal law. From 2016 through 2023, Gutknecht received repeated written reports from DeSoto describing gender-based hostility, intimidation, and retaliation, yet deliberately steered the matter into informal handling, discouraged formal complaints, failed to open any investigation, and assured administrators and Butler that no complaint would proceed.

182. Gutknecht consulted privately with Dean Brenda Bass and conveyed institutional support for Butler while mischaracterizing DeSoto's sex-based complaints as "marital status" issues—conduct not recognized under Title IX—thereby foreclosing protected claims. When an investigation was finally opened in 2024 after DeSoto retained counsel, Gutknecht oversaw a process that departed from basic Title IX requirements: witnesses were intimidated, exculpatory evidence was not preserved, and no investigative report was produced after nearly a year. When DeSoto properly raised a written bias complaint under Process B §7, Gutknecht and the University ignored it, and the investigation was then halted entirely.

183. This pattern—documented by contemporaneous emails, admissions by University Counsel, and corroborating witnesses—constitutes deliberate indifference, bad faith, and

intentional interference with clearly established procedural rights. Gutknecht's actions were not discretionary judgment calls but knowing violations of mandatory duties, removing any claim to qualified immunity. These facts are summarized chronologically below and demonstrate years of actual notice, repeated requests for investigation, and Gutknecht's consistent refusal to initiate or permit a formal Title IX process.

184. By contrast, when administrators initiated a student complaint against DeSoto in 2024, Gutknecht's office rapidly mobilized Process B while isolating DeSoto from the student, restricting corrective communication, permitting undisclosed interviews, and advancing the matter to findings and sanctions without affording DeSoto guaranteed access to evidence or a meaningful opportunity to respond, in violation of Process B §§8 and 17. This pattern began at the outset: two days after the initial informal resolution attempt, on January 27, 2017, Gutknecht spoke off the record with Butler—the respondent—and told him that she believed DeSoto's concerns "did not rise to the level of marriage discrimination," a characterization later disclosed by Bilder to OCR/ICRD.

185. As Title IX Coordinator and head of OCEM, Gutknecht also failed to protect witnesses and preserve evidence. After staff member Dorothy Burt reported that Butler had yelled at her, seized departmental records documenting accommodated testing practices, and demanded access to her private communications with DeSoto, OCEM was notified and responded not by protecting the witness but by issuing an email implying that witnesses were being intimidated by DeSoto—thereby reinforcing Butler's coercion. Gutknecht took no steps to prevent actual intimidation, secure evidence, or compel cooperation, despite Process B's guarantees of an equitable investigation, protection from retaliation, and preservation of evidence (§17). This failure, following years of reports, constitutes deliberate indifference to known

retaliation, witness intimidation, and evidence interference, undertaken with actual knowledge and in conscious disregard of mandatory policy obligations.

186. The actions in this subsection are in no way to be considered all-inclusive and are simply meant as a summary of the allegations against Bilder for the benefit for the reader.

### D. Role of Brenda White – OCEM Investigator

187. In addition to White's specific acts and omissions stated above, the following paragraphs set forth specific instances of illegal and actionable conduct.

188. Defendant Brenda White, acting as Investigator in the student complaint against DeSoto, failed to conduct an equitable investigation as required by UNI Process B and Title IX. White omitted plainly relevant and exculpatory evidence, declined to interview key witnesses identified by DeSoto, and produced a report that adopted administrative narratives while disregarding contradictory facts. Despite mandatory training requiring neutrality, full evidence reviews, and independence, White acquiesced to procedural deviations and investigative constraints imposed by senior administrators, including Gutknecht and Bilder. These actions constitute knowing departures from required investigative standards, undertaken in bad faith and in violation of clearly established rights.

189. The actions in this subsection are in no way to be considered all-inclusive and are simply meant as a summary of the allegations against Bilder for the benefit for the reader.

### E. Role of Kaylee Michelsen Deputy Title IX Coordinator and Investigator

190. In addition to White's specific acts and omissions stated above, the following paragraphs set forth specific instances of illegal and actionable conduct.

191. Defendant Kaylee Michelsen, acting as Deputy Title IX Coordinator, participated in and facilitated procedural deviations during the student complaint process that denied DeSoto a fair and impartial investigation. Michelsen failed to protect witnesses from intimidation, and

did not intervene when evidence was withheld or when exculpatory information was ignored. Despite her training and duty to ensure compliance with Process B §§ 8 and 17, Michelsen acquiesced in practices that materially advantaged the complainant narrative and disadvantaged DeSoto, constituting knowing violations of clearly established procedural rights.

192. Furthermore, Michelsen received direct notice from departmental staff member Dorothy Burt that Department Head Adam Butler had repeatedly yelled at her over several years, made her cry, confiscated departmental records relevant to accommodations, and intimidated her regarding her communications with Dr. DeSoto. Burt reported this conduct during an interview conducted by Michelsen in her capacity as investigator in the DeSoto matter, after being encouraged to disclose the full scope of Butler's behavior. Despite this direct notice of employee-on-employee harassment, witness intimidation, and evidence interference—conduct requiring independent action under Title IX and Process B—Michelsen did not initiate a separate investigation, did not implement protective measures, and did not refer the matter for independent review. Instead, Michelsen issued a "witness follow-up" communication that Burt reasonably understood as reinforcing Butler's authority rather than protecting her This was not an exercise of discretion but a failure to act in the face of known misconduct and mandatory investigative obligations, evidencing bias, deliberate indifference, and knowing disregard of mandatory investigative obligations.

### F. Role of Adam Butler – Department Head

193. In addition to Butler's specific acts and omissions stated above, the following paragraphs set forth specific instances of illegal and actionable conduct.

194. Defendant Adam Butler personally engaged in sex-based harassment, retaliation, and interference with protected activity in violation of UNI Policy 13.02 (Process B), Title VII,

and Title IX. Butler made demeaning and gender-based remarks to Dr. DeSoto concerning her marital status and motherhood, threatened adverse teaching assignments uniquely burdensome to her as a woman and single parent, and escalated hostility after she sought assistance from OCEM. Butler further retaliated against DeSoto by issuing false reprimands, fabricating claims of staff distress, disparaging her mental health, intimidating corroborating witnesses, interfering with evidence, and providing undisclosed, *ex parte* information to decision-makers in the student complaint process.

195. Butler knowingly participated in and advanced a manufactured disability discrimination complaint against DeSoto after she engaged in protected speech and Title IX activity. After receiving notice of potential investigation, Butler confiscated and removed departmental records documenting routine psychology testing accommodations provided to SAS students. These records would have demonstrated that accommodated testing was a long-standing departmental practice and were never produced to investigators or decision-makers. Butler also confronted departmental staff member and witness Dorothy Burt regarding her communications with DeSoto, told her that cooperating as witness causes problems, demanded access to her personal cellphone, conduct after which Burt reported feeling fearful, stressed, and reluctant to speak. Burt subsequently informed DeSoto and OCEM that Butler's actions made her feel fear and intimidated-- and confirms that Butler's conduct interfered with her willingness to cooperate as a witness. Butler's actions were intentional, unwelcome, and undertaken with actual knowledge that they violated mandatory University policy and clearly established federal rights.

### G. Role of John Vallentine – Former Associate Provost

196. In addition to specific acts and omissions stated above, the following paragraphs set forth specific instances of illegal and actionable conduct.

197. Defendant John Vallentine personally participated in, directed, and ratified actions that violated mandatory University policy and deprived Dr. DeSoto of clearly established procedural rights. Vallentine was centrally involved in early administrative coordination concerning the student disability discrimination complaint against DeSoto, including undisclosed meetings, email exchanges, and Zoom communications with SAS Director Tiffany Dodd, University Counsel Ann Bilder, and other administrators before and during the initiation of the complaint. Vallentine was involved in communications with legal counsel regarding how to proceed against DeSoto while DeSoto was simultaneously attempting to resolve exam-security concerns and before the student was contacted. He further participated in off-record decision-making that **precluded and undermined** her ability to use the Faculty Petition process to resolve issues that were later used against her. Vallentine's actions were not ministerial or discretionary; they reflected knowing participation in a coordinated effort to steer, influence, and sustain a procedurally defective process designed to disadvantage DeSoto after she engaged in protected speech.

### H. Role of Brenda Bass – Dean of the College of Social and Behavioral Sciences

198. In addition to specific acts and omissions stated above, the following paragraphs set forth specific instances of illegal and actionable conduct.

199. Defendant Brenda Bass personally participated in and ratified retaliatory and discriminatory conduct by Department Head Adam Butler through her knowledge of, consultation regarding, and failure to act on reported misconduct, despite repeated notice and her

supervisory authority over the College in which the conduct occurred. Bass was consulted early by Title IX Coordinator Leah Gutknecht regarding Dr. DeSoto's complaints and, rather than ensuring the matter was appropriately escalated, signaled institutional support for Butler.

200. On or about September 17, 2024, Bass received and reviewed Butler's written reprimand falsely accusing Dr. DeSoto of unprofessional conduct and implying mental-health deficiencies. After Dr. DeSoto informed Bass of the circumstances and requested that she look into the matter, Bass acknowledged that the behavior Butler claimed was unprofessional did not appear problematic on its face but nevertheless suggested—without evidence—that there "must have been more." Yet Bass declined to take further action or look inro it as requested. By allowing the reprimand of Sept 17 as well as others prior to stand unexamined and to circulate within the administration, Bass knowingly permitted false and retaliatory allegations to become embedded in the institutional record and later relied upon in adverse proceedings against DeSoto.

201. Bass's inaction occurred with notice of Butler's pattern of behavior and foreseeably exposed other women within the College whom she supervised—including staff and faculty working under Butler—to continued intimidation and retaliation, thereby undermining the safety, integrity, and functioning of the academic community she was responsible for overseeing. Bass's conduct did not involve discretionary academic judgment but constituted knowing acquiescence in retaliatory conduct and procedural irregularities after receiving direct notice, contributing to and ratifying the violations alleged above.

### I. Role of Jose Herrera - Provost

202. In addition to specific acts and omissions stated above, the following paragraphs set forth specific instances of illegal and actionable conduct. Defendant Jose Herrera personally participated in and ratified violations of mandatory faculty-governance and due-process

requirements set forth in the UNI Faculty Handbook and expressly incorporated AAUP standards.

203. As Provost, Herrera exercised ultimate administrative authority over faculty review structures, including the Faculty Petition Committee and the faculty-controlled processes required under Chapters 11, 12, and 13 of the Handbook. Despite clear policy mandates and formal notice of noncompliance, Herrera refused to ensure the appointment and functioning of required faculty bodies, including declining to appoint a faculty member to the Faculty Petition Committee as required, thereby preventing the committee from operating in a manner compliant with AAUP standards and ensuring the committee did not comply with UNI's own policies. Herrera knowingly allowed these processes to remain structurally defective after the AAUP formally identified them as noncompliant, and he failed to correct or remedy these defects despite having both the authority and obligation to do so. This refusal was not an exercise of discretion but a knowing abdication of mandatory duties, undertaken with awareness that it would deprive Dr. DeSoto of guaranteed faculty review and appeal rights, and thus constituted intentional interference with clearly established procedural protections.

## J. Role of Mark Nook – University President

204. In addition to specific acts and omissions stated above, the following paragraphs set forth further instances of illegal and actionable conduct.

205. Defendant Mark Nook received repeated, detailed written notice of bias, procedural violations, and retaliation in the handling of complaints involving Dr. DeSoto and Department Head Adam Butler and declined to intervene. In or about March 2025, DeSoto formally notified Nook of bias within the OCEM office. Notice to the president is, per 12.01 Process B, the proper step. It was requested that Title IX Coordinator Leah Gutknecht be

removed from decision-making authority. Despite this notice and his authority to ensure compliance with University policy and federal law, Nook took no corrective action, and indeed did not respond to this March 2025 notice.

206. Nook was notified through counsel that DeSoto's second appeal was never processed, that sanctions were imposed without completion of the appeal process, and that a student's grade had been unilaterally changed outside established procedures. Nook's continued inaction after repeated notice constituted deliberate indifference and ratification of the procedural and constitutional violations alleged above. Despite receiving AAUP advisory and warning letters addressed to him personally, identifying due-process and governance violations, Nook took no corrective action and allowed the violations to continue. At the time of Nook's inaction the requirements of Process B, the incorporation of AAUP due-process standards, and the right to appeal were all clearly established, leaving no room for reasonable mistake.

### K. Role of Tiffany Dodd – SAS Director

207. In addition to Dodd's specific acts and omissions stated above, the following paragraphs set forth specific instances of illegal and actionable conduct.

208. Defendant Tiffany Dodd personally participated in violations of mandatory procedural protections, acted outside her authorized role, and contributed to both retaliation and defamation directed at Dr. DeSoto. Acting as Director of Student Accessibility Services, Dodd was not a neutral participant but an active contributor to the events that precipitated and distorted the student complaint process.

209. Dodd knowingly provided false and misleading statements to the student concerning Dr. DeSoto, including assertions that DeSoto was hostile to students with disabilities, unwilling to provide exams or accommodate, and motivated by bias. These statements were

made despite Dodd's knowledge that were lacked factual basis. Dodd's misrepresentations improperly encouraged escalation into a formal discrimination complaint and mischaracterized both DeSoto's conduct and the applicable academic grievance processes.

210. Dodd further conveyed false and adverse characterizations of DeSoto to the Decision Maker and administrators, including claims that DeSoto had had problems working with Dodd's predecessor(s), did not follow policy DeSoto was uncooperative, obstructive, or professionally inappropriate, after DeSoto asserted her lawful rights to representation and due process. These statements were false, made with knowledge or reckless disregard of their falsity, and were reasonably foreseeable to influence adjudicative outcomes. The statements were later relied upon in the disability discrimination process to DeSoto's detriment.

211. Dodd acted outside her proper role by engaging in undisclosed communications with administrators and the Decision Maker while refusing direct communication with DeSoto, and by supplying adverse narratives without verification, documentation, or notice. Her conduct undermined the neutrality required by UNI Policy 13.02 (Process B) and deprived DeSoto of a fair and impartial process.

212. Dodd's statements to the student and to decision-makers constituted defamation per se because they falsely impugned DeSoto's professional competence, integrity, and fitness as a tenured faculty member. These statements were not protected opinion, were unnecessary to any legitimate accommodation function, and exceeded the scope of Dodd's professional duties.

213. Dodd's actions were not discretionary judgment calls. They involved knowing misrepresentation, unauthorized participation in disciplinary processes, improper influence over a student complainant, and dissemination of false statements later weaponized against DeSoto.

These acts were undertaken in bad faith and in conscious disregard of clearly established procedural and constitutional rights.

### L. Role of Amy Nielsen – Associate Provost

214. In addition to Nielsen's specific acts and omissions stated above, the following paragraphs set forth specific instances of illegal and actionable conduct.

215. Amy Nielsen personally participated in and repeatedly directed actions that obstructed mandatory faculty review and appeal processes in violation of the UNI Faculty Handbook, UNI Policy 13.02 (Process B), and clearly established procedural due-process rights. After UNI imposed major sanctions on Dr. DeSoto without a prior faculty hearing, Nielsen knowingly interfered with the non-discretionary requirement that a Faculty Hearing Board be convened upon timely request pursuant to Faculty Handbook § 11.4b.8 and Chapter 13. Rather than allowing the required faculty-controlled process to proceed, Nielsen privately met with and pressured the Chair of the Faculty to delay or halt formation of the Hearing Board, urging him to "consider the institution" and to refrain from convening the committee. Nielsen's actions constituted intentional, ex parte administrative interference with a mandatory appeal mechanism, undertaken with knowledge of governing policy and for the purpose of shielding the institution from faculty review. This conduct was not discretionary judgment but a knowing departure from required procedure, directly depriving Dr. DeSoto of clearly established due-process protections.

### M. Summary of Allegations

216. In August 2025, DeSoto again raised procedural concerns in a meeting with Michelsen and the OCRC, expressly referencing her prior 2025 letter to President Nook, which had been submitted in full compliance with UNI Policy 12.01 (Process B) for reporting bias or conflicts of interest within the OCRC's leadership. That May letter—previously flagged and

queried by counsel writing—had received no response as of August. Process B is explicit: *"If the bias or conflict relates to the Title IX Coordinator, concerns should be raised with the University President,"* and further guarantees *"the right to have reports of alleged policy violations addressed by Investigators, Title IX Coordinators, and Decision Makers who have received relevant annual training."*

217. Consistent with these requirements, DeSoto raised her concerns first with President Nook and then directly, in person, with Title IX trained Kaylee Michelsen. This constituted protected reporting under UNI Policy 12.01 and established procedural due-process standards. During the August 25, 2025 meeting, University Counsel Ann Bilder stated—on the record and in the presence of three witnesses—that unless Dr. DeSoto recanted her bias concern, the meeting would end. Dr. DeSoto declined to recant. The meeting was immediately terminated.

218. The audio recording of the meeting and the testimony of all three witnesses are consistent and unequivocal as to these facts. Following the termination of the meeting, the investigation was paused and has remained suspended to this day. No actual investigation ever occurred steps followed—only a single interview of the respondent, no findings, and no investigative report of any kind. The investigation ceased at the precise moment Dr. DeSoto refused to withdraw her protected bias complaint, with that as the stated reason for the cessation.

219. As a result, the University did not address the reported bias, did not ensure compliance with mandatory Process B procedures, and did not provide the faculty-guaranteed investigative process required by its own policies, leaving her with no remaining avenue for relief other than this action.

220. The facts demonstrate not mere negligence but a deliberate pattern of obstruction, intimidation, and bad faith. By stonewalling written complaints, ignoring mandatory procedures

under its own Process B, and demanding that DeSoto 'recant' long-standing and good-faith concerns of bias as the price of continuing an interview, UNI and its agents engaged in conduct that is fundamentally incompatible with Title IX, Due Process, and basic principles of fairness. The cumulative effect was to shield Butler, silence protected speech, end meaningful shared governance, while subjecting DeSoto to a procedurally rigged process—harassing her, chilling her protected activity, and weaponizing the very procedures meant to ensure impartiality. Federal Title IX regulations and U.S. Department of Education guidance explicitly prohibit retaliation, intimidation, or coercion against individuals for raising concerns of bias in the course of a Title IX proceeding (34 C.F.R. § 106.71). **The systemic risk became concrete when administrators unilaterally altered a student's course grade—outside faculty-controlled procedures— while simultaneously blocking any and all faculty review, appeals, and investigation of any administrative student grade change.** In that configuration, grades function not as academic judgments but as administrative instruments: student complaints are incentivized, faculty protections are neutralized, and the same officials alleged to have violated policy control whether any independent review occurs—an arrangement the AAUP has warned is incompatible with shared governance, academic freedom, and Title IX integrity. **The American Association of University Professors has long served as the authoritative national voice on academic freedom, shared governance, and faculty due process, and UNI itself has expressly incorporated AAUP standards into its governing policies.** In this matter, the AAUP repeatedly identified procedural defects that go to the core of institutional integrity: administrative gatekeeping of faculty review, unilateral grade changes outside faculty control, and the imposition of major sanctions without a prior faculty hearing. These are not technical deviations but departures from foundational safeguards designed to protect students, faculty, and

the academic mission alike. When such warnings go unheeded, judicial intervention becomes not extraordinary but necessary.  The actions described above constitute precisely the type of retaliatory and obstructive conduct that these federal protections are designed to prevent.

221.    UNI, Gutknecht, Bilder and Michelsen violated 34 CFR106.44 which specifically requires the Title IX Coordinator to do the following:

(i)      Treat the complainant and respondent equitably;

(ii)     Offer and coordinate supportive measures under paragraph (g)[8] of this section, as appropriate, for the complainant;

(iii)    Notify the complainant of the grievance procedures under § 106.45, and if applicable § 106.46, and the informal resolution process under paragraph (k) of this section;

(iv)    In response to a complaint, initiate the grievance procedures under § 106.45, and if applicable § 106.46, or the informal resolution process under paragraph (k) of this section.

222.    UNI, Gutknecht, and Michelsen, area and were in violation of 34 CFR106.44 as they did not treat DeSoto equitably. UNI, Gutknecht, and Michelsen wrongfully prejudged DeSoto's discrimination complaints telling both Butler and Bass that the complaint held no merit, improperly relabeled the complaints as "marriage status" discrimination and failed to notify DeSoto of grievance procedures for sex-based discrimination despite having conducted no investigation whatsoever. Gutknecht, in fact, stood in the way of the very law she was required to uphold.

223.    34 CFR 106.44, (k)(2) specifically "must not pressure the parties to participate in informal resolution process. Gutknecht violated this provision repeatedly over a course of years,

---

[8] Paragraph (g) outlines supportive measures to include counseling, course-related adjustments, restrictions on contacts between the parties, leaves of absence, and training and education programs related to sex-based harassment.

by dissuading DeSoto from filing a formal complaint and slow-walking alleged informal resolutions having prejudged the allegations as meritless.

224. The practice of prejudging Title IX complaints before any investigation is made, dissuading complainants from making formal complaints constitutes textbook bias by a Title IX Coordinator. UNI's Title IX policy is found in Policy 13.02. The procedure for addressing discrimination complaints is specific and provides a statement of guaranteed due process rights that were not honored.

225. There is no reasonable policy that would provide for prejudging complaints prior to formal investigation. In fact, determinations, if any, are to be made *after* formal investigation.

226. Gutknecht's biased informal judgment, presented in her position as Title IX Coordinator to the respondent and Bass was the equivalent an institutional finding of no probable cause without providing DeSoto *any* process due or otherwise.

227. That long-standing prejudgment was ultimately formalized when the investigative process was terminated at the point Dr. DeSoto declined to recant her bias concern, after which no investigation, findings, or report ever occurred—a sequence confirmed by the recording and three witnesses. As a direct result of the employer's conduct—including retaliation, denial of due process, discriminatory treatment, Professor DeSoto has experienced significant psychological harm. Prof. DeSoto is currently on medical leave due to severe work-related stress. Attempts to return to the workplace have triggered overwhelming feelings of dread, avoidance, and physiological panic reactions—notably when faced with entering the work environment or engaging with individuals associated with the retaliatory conduct. While not classified as a panic attack, these episodes have been distressing and debilitating. On May 9, 2024, Prof DeSoto sought emergency medical attention for acute stress symptoms. DeSoto has since been

under the care of a licensed clinical psychologist who is prepared to testify regarding the emotional and psychological toll caused by the employer's actions, including the ongoing impact on Complainant's ability to work safely and effectively. The stress and suffering were inflicted on her by the Defendants, and each of them.

## VI.     CAUSES OF ACTION

### Count I
### Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e et. seq.
*(Against  UNI and Butler)*

228.     DeSoto realleges ¶¶ 1 through 227 above as if set forth herein verbatim.

229.     On January 17, 2025, DeSoto also filed a complaint for sex-based discrimination and retaliation with the Iowa Civil Rights Commission which was cross filed with the Equal Opportunity Employment Commission. The complaint and questionnaire set forth a sufficient factual basis to give the Defendants notice of the subject matter of the charge  by identifying the parties giving a basis for the charge. See *Wallace v. DGT Operations, Inc.*, 442 F.3d 112, 1123 (8th Cir. 2006) (*Abrogated* on different grounds in *Torgerson v. City of Rochester*, 643 F.3d 101 (8th Cir 2011).

230.     On June 12, 2025, less than 90 days prior to the filing of this Complaint, the Equal Employment Opportunity Commission and Iowa Civil Rights Commission issued right to sue letters with respect to DeSoto's charges of discrimination thereby satisfying all administrative requirements of 42 U.S.C. Sec. 2000e et.seq. and Iowa Code Chapter 216. DeSoto has satisfied all administrative requirements and prerequisites necessary to file suit.

231.     DeSoto is a female and meets the qualifications of a "protected Party" pursuant to 42. U.S.C. 42 Sec. 2000e et. seq.

232.     DeSoto was fully qualified to hold the position of tenured professor at UNI and awas able to perform the essential functions of her job.

233.     Defendants UNI and Butler and Gutknecht discriminated against DeSoto with respect to the terms and conditions of her employment in violation of 42 U.S.C. Sec. 2000e et. seq.

234.     DeSoto was subjected to harassment by being yelled at, told to stay in her "place" at home with her husband, criticized for her mothering, , being reprimanded for normal office behavior, having a bogus disability discrimination claim brought against her, denied her protected property and liberty interests by Butler and Gutknecht. The actions by Butler and Gutknecht were unwelcome.

235.     DeSoto has suffered an "adverse employment act" as required by 42 U.S.C. Sec. 200e et. seq. including lower raises, diminished evaluations, denial of specialized programs and teaching opportunities, increased workload, exclusion from committees, and lost research and collaborative opportunities due to the time and stress imposed by Defendants' conduct.

236.     DeSoto's sex (female) was a motivating factor in the adverse employment actions taken against her.

237.     Butler's patterned actions were also directed at other female employees of the UNI both tenured faculty and staff Gutknecht's knowing inaction similarly exposed other women at the university to the same discriminatory conduct.

238.     The violations set forth above constitute an ongoing pattern of actions taken continually since 2017 and continuing through the time of suit as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the necessary time period. National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 S.Ct. 2061

(2002) (Superseded by statute on other grounds as shown in Gipaya v. Wilson, 345 F.Supp. 3d 1286, 1297 (D. Hawai'i 2018)).

239. DeSoto was retaliated against by Defendants UNI and Butleras a result of her complaints of sex-based discrimination in violation of 42 U.S.C. Sec. 2000e et. seq. Butler's retaliation includes, but is not limited to, Butler's involvement in a manufactured disability discrimination complaint against DeSoto as referenced above, drafting and filing false disciplinary statements against DeSoto, falsely disparaging DeSoto's mental health to others,

240. The actions of the Defendants, and each of them, were taken with malice, in bad faith, and/or in wanton and reckless disregard of DeSoto's rights so as to entitle her to an award of punitive damages against Butler only.

241. As a result of Defendants' acts and omissions, DeSoto has suffered and will suffer injuries and damages, including but not limited to mental and emotional distress, fear, anguish, humiliation, intimidation, embarrassment, lost enjoyment of life; lost wages, benefits, future earnings and other emoluments of employment.

WHEREFORE, DeSoto demands judgment against Defendants, and each of them, in an amount which will fully and fairly compensate her for her injuries and damages, for appropriate equitable and injunctive relief, for prejudgment and post-judgment interest, for attorney's fees and litigation expenses, for the costs of this action, and for such relief as may be just in the circumstances and consistent with the purposes of 42. U.S.C. Sec. 2000e et. seq.

**Count II**
**Violation of Iowa Code Chapter 216, the Iowa Civil Rights Act of 1965 as Amended**
*(Against UNI and Butler, Neilson, Hererra, Nook, Bilder, Michelson, and Gutknecht)*

242. DeSoto incorporates and realleges paragraphs 1-241 above as if set forth herein verbatim.

243. DeSoto is a female and meets the qualifications of a "protected Party" pursuant to Iowa Code Chapter 216 – The Iowa Civil Rights Act of 1965 as amended.

244. DeSoto was fully qualified to hold the position of tenured professor at UNI and awas able to perform the essential functions of her job.

245. DeSoto was subjected to harassment by being yelled at, told to stay in her "place" at home with her husband, criticized for her mothering , being reprimanded for normal office behavior, repeatedly given unfair performance reviews, denied full employment opportunities, having a bogus disability discrimination claim brought against her, denied her protected property and liberty interests by Butler on the basis of her sex. The actions by Butler were unwelcome.

246. Gutknecht, with actual notice of Butler's sex-based harassment and retaliation, knowingly assisted and ratified such conduct by discouraging formal complaints, mischaracterizing protected sex-based claims, coordinating off the record with Butler, failing to protect corroborating witnesses including Dorothy Burt, and selectively advancing Process B only when DeSoto was the respondent. As alleged above, this conduct constituted aiding and abetting discrimination and retaliation in violation of Iowa Code Chapter 216.

247. DeSoto has suffered an "adverse employment act" as required by Iowa Code Chapter 216 – The Iowa Civil Rights Act of 1965 as amended including lower raises, diminished evaluations, denial of specialized programs and teaching opportunities, increased workload, exclusion from committees, and lost research and collaborative opportunities due to the time and stress imposed by Defendants' conduct.

248. Defendants UNI and Neilson, Hererra, Nook, Bilder, Michelson, Butler and Gutknecht discriminated against DeSoto with respect to the terms and conditions of her

employment in violation of Iowa Code Chapter 216 – The Iowa Civil Rights Act of 1965 as amended.

249. DeSoto's sex (female) was a motivating factor in the adverse employment actions taken against her.

250. DeSoto was retaliated against by Defendants UNI and Neilson, Hererra, Nook, Bilder, Michelson, Butler and Gutknecht as a result of her complaints of sex-based discrimination in violation of Iowa Code Chapter 216 – The Iowa Civil Rights Act of 1965 as amended.

251. The violations set forth above constitute an ongoing pattern of actions taken continually since 2017 and continuing through the time of suit as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the necessary time period. National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 S.Ct. 2061 (2002) (Superseded by statute on other grounds as shown in Gipaya v. Wilson, 345 F.Supp. 3d 1286, 1297 (D. Hawai'i 2018)).

252. The actions of the Defendants, and each of them, were taken with malice, in bad faith, and/or in wanton and reckless disregard of DeSoto's rights so as to entitle her to an award of punitive damages.

253. As a result of Defendants' acts and omissions, DeSoto has suffered and will suffer injuries and damages, including but not limited to mental and emotional distress, fear, anguish, humiliation, intimidation, embarrassment, lost enjoyment of life, lost wages, benefits, future earnings and other emoluments of employment.

WHEREFORE, DeSoto demands judgment against Defendants, and each of them, in an amount which will fully and fairly compensate her for her injuries and damages, for appropriate

equitable and injunctive relief, for prejudgment and post-judgment interest, for attorney's fees and litigation expenses, for the costs of this action, and for such relief as may be just in the circumstances and consistent with the purposes of Iowa Code Chapter 216 – The Iowa Civil Rights Act of 1965 as amended.

## Count III
## Violation of 42 U.S.C. § 1983 – Violation of First Amendment Rights
*(Against Bulter, Nook, Neilson, Bilder, Dodd, Gutknecht, Vallentine, Herrera.*
*Michaelson, and Bass)*

254.    DeSoto incorporates and realleges paragraphs 1-253 above as if set forth herein verbatim.

255.    This action is brought pursuant to 42 U.S.C. 1983 and 1988 to redress the violation of DeSoto's rights secured by the First Amendment to the United States Constitution.

256.    DeSoto engaged in multiple forms of constitutionally protected speech, each of which independently and collectively gave rise to the retaliation alleged in this Count. First, she engaged in speech on matters of public concern by criticizing UNI's budgetary practices, including administrative expansion at the expense of instructional capacity, student access, and academic quality. Second, she engaged in protected activity by reporting gender-based harassment and retaliation by her supervisor, Adam Butler, to OCEM in 2016–2017 and thereafter—speech protected both as a matter of public concern and as opposition to unlawful discrimination. Third, she engaged in protected speech by asserting legal and academic-integrity objections to the unauthorized copying and cavalier handling of her original course examinations, raising concerns about copyright compliance, exam security, and the integrity of the academic process. Defendants retaliated against DeSoto for these protected activities by subjecting her to manufactured complaints, procedural obstruction, and major disciplinary

sanctions, actions that would chill a person of ordinary firmness from continuing to engage in protected speech.

257. The definition of tenure at the University of Northern Iowa is described as a "contractual employment status under which faculty members can receive job security in order to create and maintain an atmosphere for the free exchange of ideas and inquiry necessary for educating Iowa's students and advancing knowledge in democracy." Tenured professors can be terminated if they do not meet employment obligations or in cases of program termination or financial hardship for the university.

258. DeSoto has a cognizable and contractual continuing property interest in her continuing employment which specifically includes her rights to "maintain an atmosphere for the free exchange of ideas and inquiry necessary for educating Iowa's students and advancing knowledge in democracy."

259. DeSoto exercised her First Amendment Rights in presenting to faculty leadership regarding budgeting issues as set for the above. The budget issues of UNI are a genuine matter of public concern.

260. On May 8, 2024, Butler twice—without precedent or legitimate purpose—requested the content of DeSoto's presentation to faculty leadership.



261.   That same day, May 8, 2024, Butler was actively participating in administrative coordination to initiate a false disability discrimination complaint against DeSoto, demonstrating that his inquiries were not benign but part of a contemporaneous retaliatory effort directly connected to her protected speech.

262.   Butler's two email queries to DeSoto on May 8, 2024, constitute evidence that the student complaint was likely retaliatory actions for her protected speech regarding administrative spending, continuing a documented pattern dating back to 2012–2013, when national reporting highlighted UNI's targeting of DeSoto for similar criticisms. These emails, sent in the midst of a manufactured disciplinary and student complaint process, were a weaponization of false claims directed at her lawful exercise of speech to justify pretextual scrutiny and discipline. Based on information of meetings occurring on this same day and belief, Butler was not acting alone and was acting as part of a conspiracy with the other Defendants named in this Count.

263.     By leveraging manufactured and mendacious discrimination complaints against DeSoto and failing to provide full procedural mechanisms under policy 13.02 in an attempt to silence DeSoto for her criticism of UNI, the Defendants, and each of them, violated fundamental principles of academic freedom and free expression under the First Amendment, and engaged in impermissible retaliation. These actions are part of a deliberate, coordinated pattern of harassment, obstruction, and intimidation aimed at chilling DeSoto's protected activity and undermining her professional standing.

264.     Retaliation by public officials against the exercise of First Amendment rights is itself a violation of the First Amendment. As a general matter, the First Amendment prohibits government officials from subjecting individuals to retaliatory actions after the fact for having engaged in protected speech. If an official takes adverse action against someone based on that forbidden motive, and non-retaliatory grounds are in fact insufficient to provoke the adverse consequences, the injured person may generally seek relief by bringing a First Amendment claim.

265.     To establish a First Amendment retaliation claim under 42 U.S.C. § 1983, the plaintiff must show (1) she engaged in protected activity; (2) the government official took adverse action against her that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity. *Peterson v. Kopp*, 754 F.3d 594, 602 (8th Cir. 2014); *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004); *Naucke v. City of Park Hills*, 284 F.3d 923, 927-28 (8th Cir. 2002). The retaliatory conduct itself need not be a constitutional violation; the violation is acting in retaliation for the exercise of a constitutionally protected right. *Spencer v. Jackson Cnty.*, 738 F.3d 907, 911 (8th Cir. 2013). Further, "[t]o prevail in an action for First Amendment retaliation,

[a plaintiff] must show a causal connection between [the defendant's] retaliatory animus and [the plaintiff's] subsequent injury." *Kilpatrick v. King*, 499 F.3d 759, 767 (8th Cir. (2007) (citing *Hartman v. Moore*, 547 U.S. 250, 126 S. Ct. 1695, 164 L. Ed. 2d 441 (2006)).

266. DeSoto was subjected to adverse action by the Defendants, and each of them, that would chill a person of ordinary firmness from continuing to engage in protected activity. The adverse action was not only designed to chill DeSoto from exercising her right to criticize state budget matters of substantial public concern but also designed to chill DeSoto from her exercising her contractual right to "maintain an atmosphere for the free exchange of ideas and inquiry necessary for educating Iowa's students and advancing knowledge in democracy."

267. There is a substantial causal relationship between the Constitutionally protected activity and the adverse action as alleged above.

268. The Defendants, and each of them conspired to deprive DeSoto of her First Amendment Rights and engaged in overt acts as alleged above in furtherance of the conspiracy.

269. The actions of the Defendants, and each of them, were taken with malice, in bad faith, and/or in wanton and reckless disregard of DeSoto's rights so as to entitle her to an award of punitive damages.

270. As a direct and proximate cause of the above-mentioned unconstitutional actions of the Defendants, and each of them, DeSoto was injured and denied her First Amendment Rights and sustained damages as described more fully in the Damages section of the Complaint set forth below.

**Count IV**
**Violation of 42 U.S.C. § 1983 – Violation of Fourteenth Amendment Property Rights**
*(Against Bulter, Nook, Bilder, Dodd, Bass, White, Gutknecht, Nielsen, Herrera, Vallentine, and Hughes)*

271. DeSoto incorporates and realleges paragraphs 1- 270.

272. This action is brought pursuant to 42 U.S.C. 1983 and 1988 to redress the violation of DeSoto's rights secured by the Fourteenth Amendment to the United States Constitution.

273. DeSoto has a constitutionally protected property interest in her continuing employment which specifically includes her rights to "maintain an atmosphere for the free exchange of ideas and inquiry necessary for educating Iowa's students and advancing knowledge in democracy."

274. The Fourteenth Amendment prohibits deprivation of constitutionally protected property and liberty interests without procedural due process. Constitutionally protected interests are created and their dimensions defined by existing rules or understandings that stem from an independent source. In this case DeSoto's constitutionally protected property interests were created in her tenured faculty employment agreement with UNI.

275. At minimum, DeSoto was entitled to a reasonable notice and a reasonable opportunity to be heard at a meaningful time and in a meaningful manner before being deprived of a Constitutionally protected property interest.

276. When accused of disability discrimination as an employee of UNI, DeSoto's rights were set for the in policy 13.02.

277. Pursuant to policy 13.02, DeSoto was entitled to an impartial investigation and an impartial adjudication. ("All investigations are thorough, reliable, impartial, prompt, and fair."). This right is part of a right to be heard in a reasonable manner and was denied.

278. The policy specifically states that UNI will not restrict the ability of either party to gather and present relevant evidence. This right is part of a right to be heard in a reasonable manner and was denied.

279. The policy specifically states that UNI will provide an "opportunity to inspect and review all of the evidence obtained as part of the investigation that is directly related to the alleged conduct for a ten (10) business day review and comment period." This right is part of a right to be heard in a reasonable manner and was denied.

280. The policy also specifically provides that subsequent appeals are permitted "in the case of a remand for a new investigation and/or new determination by a Decision Maker." This right is part of a right to be heard in a reasonable manner and was denied by Defendants.

281. It is fundamental to a full and fair review required by the due process clause that a litigant has an opportunity to be confronted with all adverse evidence. Where a party is precluded from exercising this fundamental right because of *ex parte* communications, the review procedure is constitutionally defective and cannot be excused as harmless error. This right is part of a right to be heard in a reasonable manner and was denied. It was clearly established that a tenured public employee may not be deprived of a protected property interest through reliance on undisclosed evidence, *ex parte* communications, or defiance of a remand order without violating procedural due process.

282. DeSoto was denied the ability to review all of the evidence considered by Hughes as the Decision Maker in the Student disability discrimination complaint. Evidence provided by Butler and Dodd against DeSoto was obtained by the Decision Maker in an *ex parte* fashion. The same evidence was withheld from DeSoto by the Decision Maker based on UNI's after-the-fact assertion of attorney-client privilege.

283. The first decision on the disability discrimination complaint was specifically remanded by the Appeal Officer, Dan Schoor, for the very reason that evidence obtained from Dodd and Butler was withheld. On remand, instead of making a new determination without

considering the withheld evidence, the Decision Maker considered the *ex parte* information despite specific instructions from the Appeal Officer. DeSoto still has not been provided with the *ex parte* evidence from Dodd and Butler.

284. Without reasonable cause, Defendants Nook, Gutknecht, Vallentine, White, Bilder, Butler, and Hughes all intentionally caused a student to file a bogus claim of disability discrimination against DeSoto.

285. Defendants Nook, Gutknecht, White, Vallentine, Bilder, Butler, and Hughes all intentionally participated in a "sham" scheme to conduct a deficient and flawed disability discrimination complaint brought against DeSoto and were thereby deliberately indifferent to her rights to a full and fair investigation.

286. The Defendants, and each of them, conspired to deprive DeSoto of her Fourteenth Amendment Rights and engaged in overt acts as alleged above in furtherance of the conspiracy.

287. The actions of the Defendants, and each of them, were taken with malice, in bad faith, and/or in wanton and reckless disregard of DeSoto's rights so as to entitle her to an award of punitive damages.

288. As a direct and proximate cause of the above-mentioned unconstitutional actions of the Defendants, and each of them, DeSoto was injured and denied her Fourteenth Amendment Rights and sustained damages as described more fully in the Damages section of the Complaint set forth below.

**Count V**
**Violation of Title IX of the Education Amendments of 1972 20 U.S.C. § 1681 et. seq.**
*(Against UNI, Bulter, Nook, Bilder, Bass, Dodd, Gutknecht, White, and Michelsen)*

289. DeSoto incorporates and realleges paragraphs 1- 288 above as if set forth herein verbatim.

290. Title IX provides that ""[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

291. There is a well-established implied private right of action for alleged violations of Title VI, 42 U.S.C.S. §§ 2000d et seq., which prohibits discrimination on the basis of race in federally-funded programs.

292. The University discriminated against DeSoto on the basis of her sex by refusing to file her complaint in a timely manner and repeatedly discouraging her from filing such a complaint.

293. DeSoto was entitled to file her Title IX complaint in a timely manner. UNI's OCRC, Gutknecht, Bilder, and Michelsen repeatedly denied DeSoto this right subjecting her to escalating harassment by Butler. Interfering with DeSoto's right to file a formal Title IX complaint was done on the basis of sex and to protect a male faculty member (Butler).

294. The actions alleged above show that Butler discriminated against DeSoto on the basis of sex.

295. Sex discrimination need not be the only plausible explanation or even the most plausible explanation for a Title IX, 20 U.S.C.S. § 1681 et seq., claim to proceed.

296. When a funding recipient retaliates against a person because he complains of sex discrimination, this constitutes intentional discrimination on the basis of sex, in violation of Title IX, 20 U.S.C.S. § 1681 et seq. The Defendants, and each of them, unlawfully retaliated against DeSoto because of her prior complaints of discrimination against Butler.

297. By seeking to file formal Title IX complaint against Butler, DeSoto participated in activity protected by Title IX, and the University took adverse action against her because of their participation in that activity.

298. DeSoto asserts that because of her repeated attempts to file a Title IX complaint against Butler, Defendants Butler, Gutknecht, Dodd, Bilder, Bass, White, and Michelsen manufactured and prosecuted a bogus disability discrimination complaint against DeSoto.

299. The Defendants, and each of them, conspired to deprive DeSoto of her Fourteenth Amendment Rights and engaged in overt acts as alleged above in furtherance of the conspiracy.

300. The actions of the Defendants, and each of them, were taken with malice, in bad faith, and/or in wanton and reckless disregard of DeSoto's rights so as to entitle her to an award of punitive damages.

301. As a result of these actions, DeSoto was deprived of constitutionally protected property interests, including the imposition of major disciplinary sanctions, financial penalties, and professional restrictions, without the procedural safeguards guaranteed by policy and the Constitution. These deprivations were imposed before completion of a lawful process and were not cured by post-deprivation remedies, because appeal rights, remand procedures, and faculty review mechanisms were deliberately obstructed. Each Defendant acted under color of state law and was personally involved in authorizing, directing, ratifying, or enforcing the defective process. But for the denial of access to evidence, impartial adjudication, and meaningful appeal, the adverse findings and sanctions would not have occurred.

302. The stigmatizing finding of discriminatory harassment, combined with imposed sanctions, also altered DeSoto's reputation, legal and professional status, implicating a protected liberty interest.

303. As a tenured faculty member, DeSoto possessed a protected property interest in the exercise of core academic functions—including grading—subject only to lawful procedures. Defendants deprived her of that interest by imposing findings and sanctions that altered, overrode, or nullified her grading authority without due process.

304. DeSoto's constitutionally protected property interests also include her authority, as a tenured faculty member, to create, control, and secure her own instructional and evaluative materials, including original examinations. These materials constitute professional work product and intangible property incident to her tenured employment and academic responsibilities. Defendants interfered with, copied, retained, mishandled, and weaponized DeSoto's original examinations without notice, consent, or lawful authority, and then used disputes arising from that interference as a basis for investigation and discipline. This deprivation occurred without any pre-deprivation notice, hearing, or meaningful opportunity to be heard, and outside the procedures mandated by Policy 13.02. The unauthorized seizure and misuse of DeSoto's examinations—followed by sanctions grounded in manufactured exam-security allegations—constituted a deprivation of property without due process of law in violation of the Fourteenth Amendment.

305. Defendants Nook, Gutknecht, Michelsen, Bilder, Butler, and Hughes all intentionally participated in a "sham" scheme to conduct a deficient and flawed Title IX investigation into DeSoto's complaints of sex-based discrimination and were thereby deliberately indifferent to her rights to a full and fair investigation.

306. As a direct and proximate cause of the above-mentioned actions of the Defendants, and each of them, DeSoto was injured and sustained damages as described more fully in the Damages section of the Complaint set forth below.

**Count VI**
**Defamation**
*(Against Butler and Dodd in their Individual Capacity Only)*

307.    DeSoto incorporates and realleges paragraphs 1-303 above as if set forth herein verbatim.

308.    Butler made false statements of fact asserting that DeSoto engaged in "unprofessional" conduct, had "ongoing difficulties with professional relationships," caused stress to staff, and required mental health counseling.

309.    Butler has repeatedly defamed DeSoto including on September 17, 2024. On this day, Butler published a written reprimand falsely stating that DeSoto's conduct was "stressful" to office staff, adding that she had been "previously warned, several times, about a pattern of unprofessional communication," and that she "may find it helpful to speak with a counselor through EAP about [her] ongoing difficulties with professional relationships."

310.    These statements were false. The staff member Butler claimed was distressed, Dorothy Burt, expressly denied being upset and later confirmed that Butler—not DeSoto—had intimidated her. Butler knew or recklessly disregarded the falsity of his statements.

311.    Butler further has made oral and written statements to administrators and others asserting or implying that DeSoto was mentally unstable, unfit, or suffering from mental health problems that interfered with her professional duties. These statements were not within the confines of his official duties.

312.    Butler published these statements to third parties, including administrators and at least one faculty colleague, Helen Harton, who was not within Butler's supervisory chain, as well as others to be identified through discovery.

313. Butler's statements constituted defamation per se because they falsely impugned DeSoto's professional competence, fitness to perform her duties, and mental capacity as a tenured faculty member.

314. Butler acted with malice and bad faith. He made and repeated these statements while contemporaneously engaging in retaliatory conduct against DeSoto, fabricating staff distress, refusing to verify facts, or meet to discuss and resolve, and using his position to discredit her after she engaged in protected activity.

315. Butler's statements were not protected opinion, were not made for any legitimate disciplinary purpose, and were outside the scope of his professional duties. Alternatively, even if made within his employment, they were malicious abuses of position and not entitled to qualified privilege.

316. Butler's defamatory statements injured DeSoto's reputation, caused emotional distress, and contributed to professional and economic harm. Because the statements constitute defamation per se, damages are presumed.

317. Butler's actions were taken with malice, in bad faith, and in wanton and reckless disregard of DeSoto's rights, entitling her to punitive damages.

318. As a direct and proximate cause of the above-mentioned actions of Butler, DeSoto was injured sustained damages as described more fully in the Damages section of the Complaint set forth below. Dodd knowingly provided false and misleading statements to the student concerning Dr. DeSoto, including assertions that DeSoto was hostile to students with disabilities, unwilling to provide exams or accommodate, and motivated by bias. These statements were made despite Dodd's knowledge that were lacked factual basis. Dodd's misrepresentations improperly

encouraged escalation into a formal discrimination complaint and mischaracterized both DeSoto's conduct and the applicable academic grievance processes.

319. Dodd further conveyed false and adverse characterizations of DeSoto to the Decision Maker and administrators, including claims that DeSoto had had problems working with Dodd's predecessor(s), did not follow policy DeSoto was uncooperative, obstructive, or professionally inappropriate, after DeSoto asserted her lawful rights to representation and due process. These statements were false, made with knowledge or reckless disregard of their falsity, and were reasonably foreseeable to influence adjudicative outcomes. The statements were later relied upon in the disability discrimination process to DeSoto's detriment.

320. Dodd's statements to the student and to decision-makers constituted defamation per se because they falsely impugned DeSoto's professional competence, integrity, and fitness as a tenured faculty member. These statements were not protected opinion, were unnecessary to any legitimate accommodation function, and exceeded the scope of Dodd's professional duties. Dodd's defamatory statements injured DeSoto's reputation, caused emotional distress, and contributed to professional and economic harm. Because the statements Dodd's actions were taken with malice, in bad faith, and in wanton and reckless disregard of DeSoto's rights, entitling her to punitive damages.

**Count VII**
**Intentional Infliction of Emotional Distress**
*(Against Butler and Dodd in their individual capacity only)*

321. DeSoto incorporates and realleges paragraphs 1- 320 above as if set forth herein verbatim.

322. The actions of Butler and Dodd, as alleged above, constitute outrageous conduct and were outside the scope of his professional duties.

323. As a direct result of Dodd's and Butler's actions, DeSoto has suffered severe or extreme emotional distress.

324. Dodd's and Butler's outrageous conduct was a cause of Dr. DeSoto's emotional distress.

325. Dodd's and Butler's actions were taken with malice, in bad faith, and/or in wanton and reckless disregard of DeSoto's rights so as to entitle her to an award of punitive damages.

326. The actions and comments of Dodd and Butler were outside the scope of professional employment. This conduct included knowingly fabricating misconduct, weaponizing mental-health stigma, orchestrating false accusations, and subjecting DeSoto to prolonged professional humiliation and psychological harm in retaliation for protected activity.

327. As a direct and proximate result of the conduct, DeSoto suffered severe emotional distress, including documented psychological injury requiring medical care.

328. Defendants' conduct was malicious, willful, and beyond all bounds of decency tolerated in a civilized society, entitling DeSoto to compensatory and punitive damages.

329. As a direct and proximate cause of the above-mentioned actions, , DeSoto was injured sustained damages as described more fully in the Damages section of the Complaint set forth below.

**Count VIII**
**Breach of Contract**
*(Against UNI)*

330. DeSoto incorporates and realleges paragraphs 1- 326 above as if set forth herein verbatim.

331. DeSoto and UNI entered into a contract for employment with mutual consideration.

332. As part of the terms of the contract DeSoto and UNI agreed to certain policies and procedures including policies 12.01 (link: 12.01 Student Academic Grievance | University Policies) and 13.02 (also known as Process B link). The Faculty Handbook is the official statement of University of Northern Iowa (University or UNI) policy governing the rights and responsibilities of faculty.

333. UNI breached policies 12.01 and 13.02 as set forth above.

334. UNI breached The Faculty Handbook including chapters 11, 12, and 13 as set forth above. The Faculty Handbook and incorporated university policies form part of the employment contract between UNI and its tenured faculty.

335. As a direct and proximate cause of breach of contract, DeSoto was injured as described more fully in the Damages section of the Complaint set forth

## VII.   DAMAGES

336. DeSoto incorporates and adopts by reference all the facts and allegations above as though fully set forth herein.

337. As a direct and proximate result of Defendants acts and omissions set forth herein, DeSoto sustained the following damages in excess of the jurisdictional requirement of this Court:

A. Past and future physical pain and suffering in an amount to be proven at trial;

B. Past and future emotional pain and suffering in an amount to be proven at trial;

C. Past and Future loss of enjoyment of life in an amount to be proven at trial;

D. Punitive damages against only the Defendants named in their individual capacities;

E. Attorney fees and costs for all claims for relief pursuant to 42 U.S.C. § 1983 and 1988, Title VII of the Civil Rights Acts of 1964 42 U.S.C. § 2000e et. seq., Title IX of the Education Amendments of 1972 20 U.S.C. § 1681 et. seq., and Chapter 216 of the Iowa Code.

F. All allowable costs, expenses and fees associated with this litigation.

## VIII.     JURY DEMAND

DeSoto, by and through her attorney, hereby requests a trial by jury in the above-entitled cause of action.

 /s/ Thomas P. Frerichs
Thomas P. Frerichs, AT0002705
**FRERICHS LAW OFFICE, P.C.**
106 E. Fourth Street
P.O. Box 328
Waterloo, IA  50704-0328
319-236-7204 (p)
319-236-7206 (f)
Email: Tfrerichs@frerichslaw.com
*Attorney for the Plaintiff*